Filed 5/7/13  Opinion following order vacating prior opinion

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>MONICA MERCADO,<br><br>　　Defendant and Appellant.<br>_____<br>In re<br><br>　　MONICA MERCADO,<br><br>　　on<br><br>Habeas Corpus. | B223451<br><br>(Los Angeles County<br>Super. Ct. No. TA105988)<br><br><br><br><br>B230947 |

　　　　APPEAL from a judgment of the Superior Court of Los Angeles County, Eleanor Hunter, Judge.  Affirmed as modified.

　　　　PETITION for writ of habeas corpus.  Denied.

　　　　Laura S. Kelly, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　　Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka and Lance E. Winters, Assistant Attorneys General, Zee Rodriguez, Mary Sanchez, Joseph P. Lee and Susan Sullivan Pithey, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Monica Mercado, appeals the judgment entered following her conviction for second degree murder and attempted murder, with enhancements for inflicting great bodily injury and inflicting injury knowing the victim was pregnant (Pen. Code, §§ 664 187, 12022.7, 12022.9.)[1] She was sentenced to state prison for a term of 32 years to life. In a related habeas corpus petition, Mercado claims she was denied the effective assistance of counsel.

We originally issued the opinion in this case on July 21, 2011. On June 29, 2012, the United States Supreme Court vacated the judgment and remanded the case to us for reconsideration in light of a new opinion, *Williams v. Illinois* (2012) 132 S.Ct. 2221 [183 L.Ed.2d 89]. After an initial round of supplemental briefing was solicited in order to address *Williams*, a second round was solicited because the California Supreme Court subsequently issued a trio of decisions analyzing *Williams*. After giving due consideration to all these high court opinions, we now reach the same result we did before.

The judgment is affirmed as modified. The habeas corpus petition is denied.

### BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

    a. *Porsche Davis's testimony.*

Defendant Mercado and Porsche Davis were romantically involved with the same man, Bryant Waller. Davis testified she and Mercado had been fighting over Waller for three years. Davis testified she and Waller were living together, and that she believed he had ended his relationship with Mercado.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

On April 5, 2009, Davis was eight months pregnant with Waller's child. That morning, as Davis was walking home from a McDonald's restaurant, she saw Mercado and Waller in a green Range Rover. Mercado was driving. Davis was angry because Waller had their car keys and she had been calling him because she was hungry; she felt Waller should have brought her breakfast that morning.

Mercado stopped the car. Davis walked to the passenger side and told Waller to give her their car keys. Waller tried to open the passenger door, but it wouldn't open. Mercado called Davis a bitch and Davis threw a cup of orange juice into the car, splashing Waller. Mercado drove off as Davis walked away. Davis looked to make sure Mercado was gone because Mercado had tried to run her over in the past. When she saw Mercado pull into a driveway, Davis kept walking. But when she looked again, Mercado was driving right toward her. Davis heard Waller say something like "watch out" or "Porsche, move." Davis put her hands on the car hood, curled into a ball and held her stomach. The next thing she knew she was underneath the Range Rover: "I just felt my baby go in my back and that was it. . . . And my stomach just went flat instantly." The front and back tires of the Range Rover had driven over her. Davis testified the car did not swerve before it hit her, and she never heard any sound to indicate Mercado had applied the brakes.

Davis was taken to a hospital. Her baby, delivered by cesarean section, was born critically injured and did not survive. Davis suffered a cracked pelvis, broken ribs and injuries to her spine and shoulder. She was hospitalized for three and a half weeks before being transferred to a rehabilitation center.

b. *Bryant Waller's testimony.*

Waller testified he had spent the night before the incident at Mercado's home after she invited him to come over. Mercado had previously obtained a restraining order against Waller, who had a prior conviction for domestic violence, but they spent an enjoyable evening. The next morning, Mercado drove them to a Jack in the Box in her Range Rover. After leaving the restaurant, Waller saw Davis walking down the street. He told Mercado to ignore her. Mercado stopped the car. She and

3

Waller talked about spending a day with their two boys. Mercado brought up Davis's pregnancy and said, ". . . I can't believe that you're going to let her have this baby." Waller said Davis was eight months pregnant and there was nothing he could do about it. Mercado seemed upset, but not really angry.

While he and Mercado were talking, Davis walked up and asked him for the keys to their car. When Davis used the word "bitch," Mercado said, "[H]old on bitch," and Davis tossed her cup of orange juice into the car, hitting Waller in the face. Everybody started screaming. Mercado put the Range Rover into reverse and backed up. Waller told her to pull over. Mercado asked if he was going "to save this bitch." Waller tried to get out of the car but he had trouble opening the door. The car started moving.

Mercado turned into a driveway, backed out, and started driving down the street. Waller was still trying to get the passenger door open. When he finally succeeded in getting it open a little, Mercado grabbed him and again asked if he intended "to go help this bitch." The car swerved when Mercado grabbed him. At that moment, the Range Rover hit Davis, although Waller did not see the actual impact. After Mercado let Waller out of the car a half block away, he ran back to Davis. Mercado drove off.

After listening to a recording of his police interview from the day after the incident, Waller acknowledged that as Mercado turned her car around in the driveway she said, "Oh, I'm going to kill this bitch." He added, "But I don't think that she meant it in that form." Waller also told the police that Mercado "backs up and then she guns towards my girl. And runs her over." Asked at trial if Mercado had driven right at Davis, Waller answered no. But the recording showed Waller had told police that Mercado "went right at her." Although at trial Waller testified he could not say if Mercado had acted deliberately, he told police he had "no sympathy for her" because "don't nobody on God's green earth would do anything to gun a pregnant woman down." At trial, Waller agreed he had been pretty clear in his police interview that he believed Mercado acted deliberately.

4

Waller also acknowledged that when he subsequently spoke to Mercado in jail, he told her he would wait for her and marry her. He told her he would "give them all the information they need to help" Mercado get out of jail. Waller acknowledged he did not tell police there had been any kind of "tussle" inside the car between him and Mercado, or that Mercado had grabbed his arm just before the car hit Davis.

On cross-examination by defense counsel the following colloquy occurred:

"Q. Mr. Waller, looking back on everything that happened and trying to remember what all you heard, are you certain that she said, 'I'm going to kill that bitch,' or could she have said something else?

"A. If it's what I said . . . in the police report, it's what was said."

c. *Independent eyewitness testimony.*

Bruce Cotton, a truck driver, was sitting on his porch that morning. He saw Davis walking down the street and arguing with Waller, who was riding in a car. Davis was yelling at him: "Give me my keys, give me my keys." Mercado pulled over and parked, and Cotton heard all three of them arguing. When Mercado started driving again, Davis walked after the car yelling, "[P]lease give me my keys." Mercado turned around, headed back toward Davis and stopped right in front of her. Davis put her hand on the hood of the car and kept yelling for her keys. Waller yelled, "No, no, don't do it. Don't do it. Stop, don't do it." Mercado "hit the accelerator" and rolled slowly over Davis. The car did not swerve or brake. Cotton testified Davis screamed and he heard her bones being crushed as Mercado ran over her with the car's front and back tires. It looked like Waller tried to get out of the car, but Mercado sped around the corner and Waller could not get out until she came to a stop. After Waller got out, Mercado sped off.

Jai Gilyard testified she was sitting in the living room of her mother's house that morning and she looked out the window when she heard loud voices. She saw Davis walking and a Range Rover driving by in the same direction. Then the same car drove by in the opposite direction. Gilyard heard someone in the car say, "If you

5

don't get from in front of my car, I'm going to run you over." Gilyard saw Davis "rolling under the car."

Meanwhile, Cotton had called 911, jumped into his car and followed Mercado. When Mercado stopped at a gas station, he pulled in behind her. Cotton testified Mercado jumped out of her car, came over to him and "in a vengeful voice . . . asked me what the hell am I following her for." When Cotton told her she'd just run over a woman and left the scene of an accident, Mercado gave him a "like, so what" look. She jumped back into her car and sped off.

d. *Medical evidence.*

Dr. Virender Rehan attended at the delivery of Davis's baby by emergency caesarian section. The baby was almost dead at birth, her heart beating only occasionally. Her skull had been fractured, she was suffering from convulsions and there was extensive internal head bleeding. It was obvious she would not survive. When life support was disconnected, the baby died within minutes.

Deputy Medical Examiner Dr. Ogbonna Chinwah was asked what his work in the Coroner's Department entailed:

"Q. What are your duties and responsibilities as a medical examiner?

"A. I examine the bodies brought into the department to determine the cause and manner of death.

"Q. What does 'manner of death' mean?

"A. Manner of death is classified in five classifications: Natural, accident, suicide, homicide, and undetermined."

Chinwah testified he performed the autopsy on Davis's baby. Because of a catastrophic skull fracture, it would have been virtually impossible to save the baby's life. Chinwah opined the cause of death had been blunt force trauma to the baby's head, and he characterized the death as a homicide. Chinwah based this homicide conclusion on information he received from a coroner's investigator indicating the baby's mother had been intentionally run over by a car.

6

e. *Prior violent incidents involving Mercado.*

Davis testified she and Mercado had had prior angry encounters during which Mercado had done such things as spraying mace into Davis's car, cutting her with a knife, and slashing her tires. During one of these encounters, Davis had pepper-sprayed Mercado. Mercado and Davis had a fight in January 2009, during which Mercado tried to run Davis down with her Range Rover. Waller had yelled at Davis to watch out, and Davis managed to jump out of the way. Mercado then crashed into the gates of a market and Davis threw a hammer at her. Davis got into her own car and Mercado chased her through the neighborhood. Later, Mercado drove into Davis's parked car.

Waller testified that once, in November 2007, he and a former girlfriend, Saraya Hollis, were riding in a car when Mercado drove up. Waller got out and Mercado started chasing Hollis. When Hollis returned, there was a dent in the car because Mercado had hit it. The next morning, Waller and Hollis were again driving when Mercado came up behind them and "bumped" their car.

Waller testified that, in addition to Davis's baby and the children he had with Mercado, he also had three children with Gwanna Hayes. In September 2007, Mercado came to Hayes's house looking for him. When Waller opened the door, Mercado "ran inside" and "[s]tarted banging up stuff." She smashed photographs of Waller and his children, and broke the window of Waller's car. Waller called the police.

Hollis also testified about the November 2007 incident. She was sitting in a car with Waller when Mercado approached and began arguing with him. When Hollis drove off, Mercado chased her and repeatedly ran into the car. The next morning, when Hollis was dropping Waller off, she noticed Mercado behind her. Hollis got out and they had words. Mercado then tried to hit Hollis with her car. Hollis moved out of the way and Mercado hit Hollis's car. Hollis filed a police report.

7

2. *Defense evidence.*

Mercado's sister, Violeta, testified that when she lived with Mercado in 2007-2008, Davis used to drive by and look at their house five or six times a month. Once, Davis came into their yard and threw a Coke can or bottle at the windshield of Violeta's car. When Violeta yelled at her, Davis asked, "Where the fuck is your bitch ass sister." Davis, who had a wrench in her hand, also said: "Oh, you just watch and see, I have something for that bitch."

Mercado's other sister, Gabriela, testified that once in March 2008 she was babysitting at Mercado's house while Mercado and Waller went out. At 2:30 a.m., she heard Mercado yelling. Running outside, Gabriela saw Mercado in her car and Davis running up to the car with a hammer. Davis started banging on Mercado's car with the hammer. Waller was there, yelling at Davis to leave. Mercado got out of the car and started fighting with Davis.

Mercado testified in her own defense. She had prior convictions for petty theft and grand theft. Mercado and Waller had two young children. Mercado testified Waller lived with her during the "whole course of [their] relationship." Mercado first learned Waller was seeing Davis two or three years ago. She and Davis had been engaged in a running battle over Waller, and she had told Davis to leave Waller alone many times.

On the morning of April 5, as she and Waller were driving home from Jack in the Box, Waller suddenly told her, "Man, just go straight and avoid the bullshit." When Mercado pulled over and asked what he was talking about, Waller said Davis was pregnant. Mercado started crying and asked why Davis was having the baby. Waller said there was nothing he could do because she was eight months pregnant. Mercado said, "I can't believe that she's going to have your baby." Just then, Davis appeared and said, "You're still fucking with this bitch. Give me my keys. Give me my keys." When Waller told her to hold on a minute, Davis threw her orange juice into the car.

8

Mercado decided to drive home, so she pulled into a driveway. Before backing up, she looked in both directions and saw Davis on the sidewalk. As Mercado put the car into reverse, Waller tried to get out. Mercado was upset. She pulled on him and Waller pushed her; they were screaming at each other. After turning around in the driveway, Mercado was going 20 or 25 miles per hour. Waller was still trying to get the car door open and Mercado was pulling on his arm. Mercado never saw Davis standing in the street. When she felt the impact, she got scared and drove off.

Mercado denied intentionally hitting Davis. She denied having said, "If you don't move, I'm going to run you over," or, "I'm going to kill this bitch." She testified Waller never said, "No, don't do it, don't run her over." Mercado also denied trying to run Hollis down, but admitted hitting the car Hollis had been sitting in.

## CONTENTIONS

1. The trial court misinstructed the jury when it asked a question while deliberating.

2. Defense counsel was ineffective for not obtaining a report of Mercado's psychological examination until after the trial.

3. The medical examiner's testimony characterizing the baby's death as a homicide violated the confrontation clause.

4. There was cumulative error.

5. There was sentencing error.

## DISCUSSION

1. *Trial court properly answered the jury's question during deliberations.*

Mercado contends her convictions must be reversed because the trial court gave an incorrect answer when, during deliberations, the jury asked a question about the murder and voluntary manslaughter instructions. This claim is meritless.

9

a. *Background.*

The jury was given CALCRIM No. 520, defining murder. This instruction stated, in part:

"The defendant is charged in Count I with murder. To prove the defendant is guilty of this crime, the People must prove that:

"Number one, the defendant committed an act that caused the death of another person;

"Two, when the defendant acted she had the state of mind called malice aforethought;

"And three, she killed without lawful excuse or justification.

The jury was also given CALCRIM No. 570, defining voluntary manslaughter, which stated:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in heat of passion.

"The defendant killed someone because of sudden quarrel or in heat of passion if:

"Number one, the defendant was provoked;

"Number two, as a result of the provocation the defendant acted rashly and under influence of intense emotions that obscured her reasoning or judgment;

"And three, the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than judgment."

While deliberating, the jury sent the following note to the trial court: "Definition of § 520/570 contains 3 points; In both Sections does all 3 criteria have to be met in order to meet verdict of the § 520 or § 570?" The trial court responded with a one word answer: "Yes."

10

b.  *Discussion*.

Mercado contends:  "While the three elements of murder, of course, all had to be proven beyond a reasonable doubt in order for the jury to return a verdict of guilty of murder, the three 'criteria' contained in CALCRIM 570, the voluntary manslaughter instruction, did not have to be 'met' in order for the jury to return a voluntary manslaughter verdict.  Rather, the prosecution had to disprove, beyond a reasonable doubt, the existence of passion/quarrel and provocation as defined by the three criteria in the instructions, in order for the jury to find Ms. Mercado guilty of murder.  [¶]  The court's error erroneously shifted the burden of proof on the issue of provocation and passion/quarrel and relieved the prosecution of proving an essential element of malice – the absence of provocation and passion/quarrel."

Noting that "[a]bsence of a sudden quarrel or heat of passion is a fact the prosecution must prove beyond a reasonable doubt when murder and voluntary manslaughter are under joint consideration" (*People v. Najera* (2006) 138 Cal.App.4th 212, 223), Mercado argues:  "By informing jurors that the elements of passion/quarrel had to be 'met' in order for the jury to return a voluntary manslaughter verdict, *and by treating these elements as analogous or comparable to the elements of murder*, the trial court erred."  (Italics added.)

We are not persuaded.

Mercado's argument appears to be predicated on a misreading of the record.  For instance, she poses the issue this way:  "The deliberating jury asked the court whether the elements of murder had to be met in order to return a murder verdict, and whether the three criteria establishing  provocation/passion had to be met in order to return a voluntary manslaughter verdict.  The court answered 'yes.' "  But this formulation misconstrues the essence of the jury's question, which was:  As to both instructions, do *all three elements* have to be satisfied?  The proper answer to this question was indeed "yes."  By focusing on the "had to be met" language, rather than on the "all three elements" language, Mercado makes it sound like the jury was asking about the burden of proof.  As we read the jury's question, however, it had to

11

do with whether *all three elements* of each instruction, both CALCRIM No. 520 and CALCRIM No. 570, were necessary elements, i.e., whether the elements were conjunctive or disjunctive. The trial court properly answered by saying the elements were conjunctive.

Moreover, the jury was given the following clear direction as part of the voluntary manslaughter instruction: "The People have the burden of proving beyond a reasonable doubt the defendant did not kill as a result of a sudden quarrel or in heat of passion. [¶] If the People have not met this burden, you must find the defendant not guilty of murder."

Hence, the trial court's answer was correctly directed at the actual question the jury asked. We agree with the Attorney General that, given all the instructions, it is not reasonably likely the jury "misapplied the trial court's . . . response in a manner that shifted the burden of proof."

The trial court did not err in responding to the jury's question.

2. *Failure to obtain Mercado's psychological report from expert did not constitute ineffective assistance of counsel.*

Mercado contends she was denied effective assistance because defense counsel arranged for her to be interviewed by a psychologist, but then failed to obtain the psychologist's report in time to use it at trial. This claim is meritless.

a. *Background.*

On the day voir dire commenced, the trial court asked defense counsel about the proposed testimony of Dr. Sandra Baca, who had been engaged as a defense expert. Baca, a licensed marriage and family therapist, and an expert on domestic violence, had interviewed Mercado five days earlier. Defense counsel replied, "I'll know when I get a report. This is an expert in domestic violence. We do know that Miss Mercado has been a victim of continuous domestic violence by Mr. Waller." When the trial court questioned the relevance of such psychological evidence since Waller had not been the victim, defense counsel said, "I won't know until I get the report."

12

Three days later, just prior to opening statements, the trial court remarked the defense theory had evolved from self-defense to accident and asked if Baca were being dropped as a witness. Defense counsel said he intended to have her testify, although he still did not have her report. The trial court ruled Baca's testimony would be excluded unless the defense could make a more specific offer of proof. There was no further offer of proof and Baca did not testify.

After Mercado's conviction, defense counsel included a copy of Baca's report, which was not written until after Mercado had been convicted, as part of a sentencing memorandum. The report said Mercado told Baca that, when she was a child, her father had been physically abusive. Mercado tried to protect her two younger sisters when her parents argued, and she tried to protect her mother from her father. The report said Mercado had two sons by a man named George Jenkins, and that these boys had been removed from Mercado's house in 2009 because of Waller's violence. Mercado described having been badly beaten by both Jenkins and Waller.

Baca's report concluded "the following susceptibility risk factors may help explain [Mercado's] actions on the day" of the incident: Mercado had been "exposed to high levels of violence in the home when she was growing up" at the hands of "an alcoholic and drug addicted father," and Mercado subsequently "repeated what she observed in her family home and became involved with men who used and abused her." Baca opined that, because "Mercado's case of repeated activation of her stress-response from the vicarious trauma she endured at [a] young age began when her brain was still developing, it may have caused an altered sensitivity and dysfunction throughout her brain. Ms. Mercado's impulse problems might be due to a change in the organization of her stress response in her neural networks."

Defense counsel subsequently filed a new trial motion. At the hearing on this motion, counsel said he did not receive Baca's report until after trial and that when he read it he realized he had not adequately represented Mercado. Counsel said he had been unaware Mercado's history of abuse included her relationship with Jenkins and her childhood. The new trial motion was denied.

13

b. *Legal principles.*

A claim of ineffective assistance of counsel has two components: " 'First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' [Citation.] To establish ineffectiveness, a 'defendant must show that counsel's representation fell below an objective standard of reasonableness. [Citation.] To establish prejudice he 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*Williams v. Taylor* (2000) 529 U.S. 362, 390-391 [120 S.Ct. 1495, 146 L.Ed.2d 389].) "[T]he burden of proof that the defendant must meet in order to establish [her] entitlement to relief on an ineffective-assistance claim is preponderance of the evidence." (*People v. Ledesma* (1987) 43 Cal.3d 171, 218.)

An appellate court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." (*Strickland v. Washington* (1984) 466 U.S. 668, 697 [104 S.Ct. 2052, 80 L.Ed.2d 674].)

c. *Discussion*

Mercado contends she was prejudiced because defense counsel "proceeded to trial without having obtained a report from Dr. Baca, the expert he . . . retain[ed] – and, therefore, without considering whether expert testimony about the matters Dr. Baca wrote about in her report would have assisted Ms. Mercado's case." Mercado asserts the lack of this psychological evidence compromised her heat-of-passion attempted voluntary manslaughter defense.

14

But Mercado has not cited any authority allowing the admission of this kind of psychological evidence to establish the objective element of a heat-of-passion voluntary manslaughter defense. As *People v. Steele* (2002) 27 Cal.4th 1230, explained: "The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively. As we explained long ago . . . 'this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances,' because 'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.' [Citation.] [¶] Defendant's evidence that he was intoxicated, that he suffered various mental deficiencies, that he had a psychological dysfunction due to traumatic experiences in the Vietnam War, and that he just 'snapped' when he heard the helicopter, may have satisfied the subjective element of heat of passion. [Citations.] But it does not satisfy the objective, reasonable person requirement, which requires provocation by the victim. [Citation.] 'To satisfy the objective or "reasonable person" element of this form of voluntary manslaughter, the accused's heat of passion must be due to "sufficient provocation." ' [Citation.] '[E]vidence of defendant's extraordinary character and environmental deficiencies was manifestly irrelevant to the inquiry.' [Citation.]" (*Id*. at pp. 1252-1253.)

Here, even without the kind of testimony Baca might have provided, there was already more than enough evidence establishing the subjective element of heat-of-passion provocation, i.e., that Mercado assaulted Davis in a jealous rage after learning Davis was pregnant with Waller's child. What was missing from Mercado's heat-of-passion defense was the objective element and, as *Steele* explained, the kind of testimony Baca might have provided is irrelevant to the objective element. As the Attorney General argues, "Since Dr. Baca's report concludes that appellant's

15

responses were unique based on her alleged history of abuse, Dr. Baca's testimony would not have supported a voluntary manslaughter verdict."[2] There is no reasonable probability the psychological evidence at issue here would have made any difference in the result.

Because there was no prejudice flowing from defense counsel's failure to obtain Baca's psychological report in time for use at trial, there was no ineffective assistance of counsel.[3]

3. *Medical examiner's testimony about the baby's "manner of death" does not warrant reversal of Mercado's conviction.*

Mercado contends her conviction must be reversed because her confrontation clause rights were violated when the deputy medical examiner, Dr. Chinwah, testified Davis's baby died as a result of a homicide. This claim is meritless.

a. *Background.*

After testifying his autopsy findings led him to conclude the baby's *cause of death* had been blunt force trauma to the head, Chinwah was asked if he had determined the baby's *manner of death*:

"Q. Did you determine the manner of death based on your autopsy?

"A. Homicide.

"Q. Why did you conclude homicide?

"A. The circumstances under which this occurred was [*sic*] taken into consideration, and from the information I got was that this mother was intentionally run over by the operator of the vehicle."

---

[2] Mercado argues Baca's evidence would have been admissible under *People v. Humphrey* (1996) 13 Cal.4th 1073. But that case involved the defendant's killing of her abuser and it related to the defendant's claim of self-defense.

[3] Given this result, the related claim raised in Mercado's habeas corpus petition is denied.

16

The prosecutor's direct examination ended at this point. On cross examination, Chinwah was immediately asked where that information had come from:

"A. The coroner's office has an investigator that goes to the scene of anything that is brought into the coroner's office. [¶] And the investigator interviews different people and make [*sic*] report.

"Q. Do you know if the investigator interviewed the people that have testified in this trial about what happened?

"A. I have no idea.

"Q. So it is a flash report that you received, a flash report, a report based on one investigator's going to a scene and making a report?

"A. Yes.

"Q. Without follow-up of any other witnesses?

"A. No."

Chinwah said, "the information that I received was that the operator of this vehicle in anger moved away, rode, drove away, and made a U-turn and stated some word to the effect that I'm going to kill this – I don't want to use the word that was written in the report. [¶] And then this operator of the vehicle accelerated and ran over the pregnant mother."

Defense counsel then asked:

"Q. A car running over a person creates a massive force; isn't that true?

"A. Yes.

"Q. And your opinion of a massive force remains the same on whether it's an accidental hitting or a deliberate hitting. The massive force is still there, isn't it?"

Chinwah agreed the massive force injury could have been caused either intentionally or accidentally.

"Q. . . . You're basing your opinion upon the investigation report, isn't that right, as to how this happened?

17

"A.  That's what I said.  That's the circumstance."

Asked if new information "that contradicted the investigator's report" might change his mind, Chinwah testified:  "Except that information is totally unrelated to the original information that I got.  For example, if I got an information [*sic*] that this incident happened when there was no altercation, that this driver was not even at the scene of this altercation, and this driver was just driving by, then I would say maybe, maybe that's true.  [¶]  But the information that I got was so convincing and compatible to the finding that all the other information to me would be, maybe making up a story."

Asked if any additional information would make a difference, Chinwah testified:  "I would say it has to be very, very, very strong to make, to contradict the original story on this thing here."

On redirect-examination, the prosecutor simply asked:

"Q.  Doctor, the information you received was that the driver sped up and ran over the woman, correct?

"A.  Yes.

"Q.  And the injuries that you observed to the baby, were they consistent with the driver speeding up and running over the mother who was carrying that baby?

"A.  Yes."

b.  *Legal principles.*

Mercado contends Chinwah's testimony "that, in his opinion, the manner of death was homicide, and that his opinion was based upon a report by the coroner's investigator who interviewed witnesses at the scene, who told the investigator that 'this mother was intentionally run over by the operator of the vehicle,' " violated the confrontation clause and requires a reversal of her conviction.  We disagree.

As we have explained, *Crawford v. Washington* (2004) 541 U.S. 36 [124 S.Ct. 1354, 158 L.Ed.2d 177], established a new confrontation clause test focusing "on the 'testimonial or nontestimonial nature' of the out-of-court statement.  *Crawford* held that '[w]here testimonial statements are at issue, the only indicium of reliability

18

sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation.' [Citation.] Thus, out-of-court *testimonial* statements are admissible only when the witness is unavailable and there has been a prior opportunity for cross-examination of that witness. [¶] *Crawford* declined to define the term 'testimonial' [citation], but gave examples of testimonial statements. *Crawford* listed as testimonial: (1) plea allocutions showing the existence of a conspiracy; (2) grand jury testimony; (3) prior trial testimony; (4) ex parte testimony at a preliminary hearing; and (5) statements taken by police officers in the course of interrogations. [Citation.]" (*People v. Cervantes* (2004) 118 Cal.App.4th 162, 172.)

In *Williams v. Illinois, supra,* 132 S.Ct. 2221, the U.S. Supreme Court's most recent case discussing *Crawford*, a prosecution DNA expert "testified that a DNA profile produced by an outside laboratory, Cellmark, matched a profile produced by the state police lab using a sample of petitioner's blood. On direct examination, the expert testified that Cellmark . . . provided the police with a DNA profile. The expert also explained the notations on documents admitted as business records, stating that, according to the records, vaginal swabs taken from the victim were sent to and received back from Cellmark. The expert made no other statement that was offered for the purpose of identifying the sample of biological material used in deriving the profile or for the purpose of establishing how Cellmark handled or tested the sample. Nor did the expert vouch for the accuracy of the profile that Cellmark produced. Nevertheless, petitioner contends that the expert's testimony violated the Confrontation Clause as interpreted in *Crawford*. [¶] Petitioner's main argument is that the expert went astray when she referred to the DNA profile provided by Cellmark as having been produced from semen found on the victim's vaginal swabs." (*Id*. at p. 2227 (plur. opn. of Alito, J.).)

The fundamental question posed by these facts was this: "[D]oes *Crawford* bar an expert from expressing an opinion based on facts about a case that have been made known to the expert but about which the expert is not competent to testify?" (*Williams v. Illinois, supra,* 132 S.Ct. at p. 2227, plur. opn. of Alito, J.).)

19

Justice Alito's plurality opinion in *Williams* (joined by with three other justices),[4] concluded this testimony did not present a confrontation clause problem because: (a) the extra-judicial statements had not been offered to prove the truth of the matters asserted, but only as the basis for the testifying witness's opinion; and, (b) even if asserted for its truth, the primary purpose of the Cellmark report had not been to aid in the defendant's prosecution: "The Cellmark report is very different from the sort of extrajudicial statements, such as affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach. The report was produced before any suspect was identified. The report was sought not for the purpose of obtaining evidence to be used against petitioner, who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose." (*Id*. at p. 2228.) In the plurality's view, to qualify as "testimonial" the extra-judicial statement must have had "the primary purpose of accusing a targeted individual." (*Id*. at p. 2243.)

Justice Thomas's concurrence, while agreeing there was no confrontation clause violation, rejected both grounds of the plurality's rationale. He concluded that, although the evidence had indeed been admitted for its truth, and although the plurality's "primary purpose" analysis was incorrect, there was no confrontation clause violation "solely because Cellmark's statements lacked the requisite 'formality and solemnity' to be considered ' "testimonial" ' for purposes of the Confrontation Clause." (*Williams v. Illinois, supra,* 132 S.Ct. at p. 2255 (conc. opn. of Thomas, J.).)

Justice Thomas explained: ". . . I have concluded that the Confrontation Clause reaches ' "formalized testimonial materials," ' such as depositions, affidavits, and prior testimony, or statements resulting from ' "formalized dialogue," ' such as custodial interrogation. [Citations.] [¶] Applying these principles, I conclude that

---

[4]     Justice Alito's plurality opinion was joined by Chief Justice Roberts and Justices Kennedy and Breyer.

Cellmark's report is not a statement by a 'witnes[s]' within the meaning of the Confrontation Clause. The Cellmark report lacks the solemnity of an affidavit or deposition, for it is neither a sworn nor a certified declaration of fact. Nowhere does the report attest that its statements accurately reflect the DNA testing processes used or the results obtained. . . . [Citation.] And, although the report was produced at the request of law enforcement, it was not the product of any sort of formalized dialogue resembling custodial interrogation." (*Williams v. Illinois, supra,* 132 S.Ct. at p. 2260, fn. omitted (conc. opn. of Thomas, J.).)

Justice Kagan's dissenting opinion (joined by three other justices),[5] disagreed with both the plurality and Justice Thomas, and would have found the confrontation clause had been violated. Most pertinent to our analysis, the dissent characterized the primary purpose test as "a statement meant to serve as evidence in a potential criminal trial." (*Williams v. Illinois, supra,* 132 S.Ct. at p. 2275 (dis. opn. of Kagan, J.).)

The California Supreme Court has given its initial analysis of *Williams* in a trio of cases: *People v. Dungo* (2012) 55 Cal.4th 608, *People v. Lopez* (2012) 55 Cal.4th 569, and *People v. Rutterschmidt* (2012) 55 Cal.4th 650. *Lopez* summed up *Williams* this way: "Although the high court has not agreed on a definition of 'testimonial,' a review of [its] decisions indicates that a statement is testimonial when two critical components are present. [¶] First, to be testimonial the out-of-court statement must have been made with some degree of formality or solemnity. [Citations.] The degree of formality required, however, remains a subject of dispute in the United States Supreme Court. [Citations.] [¶] Second, all nine high court justices agree that an out-of-court statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution, but they do not agree on what the

---

[5]     Justice Kagan's dissenting opinion was joined by Justices Scalia, Ginsburg and Sotomayor.

21

statement's primary purpose must be." (*People v. Lopez, supra,* 55 Cal.4th at pp. 581-582.)

Justice Chin's concurring opinion in *Dungo* (joined by three other justices), contains an amplified explanation of how to harmonize the views expressed in *Williams*: " 'When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . ." ' [Citation.] This rule does not work particularly well, if at all, unless 'one opinion can be meaningfully regarded as "narrower" than another,' that is, unless 'one opinion is a logical subset of other, broader opinions.' [Citation.] Here, neither the plurality opinion nor Justice Thomas's concurring opinion can be viewed as a logical subset of the other. Indeed, to some extent they are contradictory." (*People v. Dungo, supra,* 55 Cal.4th at p. 628 (conc. opn. of Chin, J.).) Nevertheless, "[w]e know what the *result* was in *Williams* . . . . The testimony at issue did not violate the confrontation clause. This is because a majority of the court so concluded. Four justices (the plurality) found no violation for their reasons. One justice (Justice Thomas) found no violation for his different reasons. This means that a majority of the *Williams* court would find no violation of the confrontation clause whenever there was no violation under the plurality's *and* under Justice Thomas's reasoning." (*Ibid.*)

Of the three California cases decided in the aftermath of *Williams,* the decision in *Dungo* is the most pertinent to the facts of the case at bar. "At . . . Dungo's murder trial, a forensic pathologist testifying for the prosecution described to the jury objective facts about the condition of the victim's body as recorded in the autopsy report and accompanying photographs. Based on those facts, the expert gave his independent opinion that the victim had died of strangulation. Neither the autopsy report, which was prepared by another pathologist [Dr. Bolduc] who did not testify, nor the photographs were introduced into evidence." (*People v. Dungo, supra,*

22

55 Cal.4th at p. 612.) The *Dungo* court held "the expert's testimony did not give rise to a right by defendant to question the preparer of the autopsy report." (*Ibid.*)

As *Dungo* explained: "We begin with the issue of formality. An autopsy report typically contains two types of statements: (1) statements describing the pathologist's anatomical and physiological observations about the condition of the body, and (2) statements setting forth the pathologist's conclusions as to the cause of the victim's death. The out-of-court statements at issue here – pathologist Bolduc's observations about the condition of victim Pina's body – all fall into the first of the two categories. These statements, which merely record objective facts, are less formal than statements setting forth a pathologist's expert conclusions. They are comparable to observations of objective fact in a report by a physician who, after examining a patient, diagnoses a particular injury or ailment and determines the appropriate treatment. Such observations are not testimonial in nature. [Citation.]" (*People v. Dungo, supra,* 55 Cal.4th at p. 619.)

As for the "primary purpose" factor, *Dungo* reasoned:

"The preparation of an autopsy report is governed by California's Government Code section 27491, which requires a county coroner to 'inquire into and determine the circumstances, manner, and cause' of certain types of death. Some of these deaths (such as deaths from alcoholism, 'sudden infant death syndrome,' and 'contagious disease') result from causes unrelated to criminal activities, while other deaths (such as deaths resulting from 'criminal abortion,' deaths by 'known or suspected homicide,' and 'deaths associated with a known or alleged rape') result from the commission of a crime. [Citation.] With respect to all of the statutorily specified categories of death, however, the scope of the coroner's statutory duty to investigate is the same, regardless of whether the death resulted from criminal activity.

"The usefulness of autopsy reports, including the one at issue here, is not limited to criminal investigation and prosecution; such reports serve many other equally important purposes. For example, the decedent's relatives may use an

23

autopsy report in determining whether to file an action for wrongful death. And an insurance company may use an autopsy report in determining whether a particular death is covered by one of its policies. [Citation.] Also, in certain cases an autopsy report may satisfy the public's interest in knowing the cause of death, particularly when (as here) the death was reported in the local media. In addition, an autopsy report may provide answers to grieving family members.

"In short, criminal investigation was not the *primary* purpose for the autopsy report's description of the condition of Pina's body; it was only one of several purposes. The presence of a detective at the autopsy and the statutory requirement that suspicious findings be reported to law enforcement do not change that conclusion. The autopsy continued to serve several purposes, only one of which was criminal investigation. The autopsy report itself was simply an official explanation of an unusual death, and such official records are ordinarily not testimonial. [Citation.]

"In summary, Dr. Lawrence's description to the jury of objective facts about the condition of victim Pina's body, facts he derived from Dr. Bolduc's autopsy report and its accompanying photographs, did not give defendant a right to confront and cross-examine Dr. Bolduc. *The facts that Dr. Lawrence related to the jury were not so formal and solemn as to be considered testimonial for purposes of the Sixth Amendment's confrontation right, and criminal investigation was not the primary purpose for recording the facts in question.* In holding that defendant's confrontation right was violated here, the Court of Appeal erred." (*People v. Dungo, supra,* 55 Cal.4th at pp. 620-621, italics added.)

        c. *Discussion*.

        (1) *There was no* Crawford *violation.*

The Attorney General asserts "*Williams* has no application to the facts here and nothing in *Williams* overrules the longstanding rule in California that experts may rely upon and testify to sources on which they base their opinions." We disagree. Although the *Williams* plurality concluded expert basis testimony does not constitute hearsay because it is not admitted for its truth, both Justice Thomas and the *Williams*

dissenters rejected that analysis, concluding the evidence at issue had been admitted for its truth. (See *People v. Westmoreland* (2013) 213 Cal.App.4th 602, 621 ["A majority of the justices in *Williams*, *Dungo*, and *Lopez* determined that the challenged out-of-court statements admitted during the expert testimony in each of those cases were admitted for the truth of the facts asserted in the statements, at least for confrontation clause purposes."].)[6]

However, in light of *Dungo*'s analysis of *Williams,* we conclude the extra-judicial statements relied on by Dr. Chinwah in reaching his conclusion about the baby's manner of death were not "testimonial" under *Crawford*. Mercado mounts a series of arguments against this conclusion, but we do not find them persuasive.

Mercado argues *Dungo* is fundamentally different from the case at bar: "Although like the statements at issue in *Dungo*, the statements at issue here relate to the cause and manner of death, the similarity ends there. The statements at issue here, rather than being objective scientific facts, were the observations and conclusions of lay witnesses. These eyewitness statements are in no way 'comparable to observations of objective fact in a report by a physician who, after examining a patient, diagnoses a particular injury or ailment and determines the appropriate treatment.' "

We disagree. *Dungo* was contrasting the "formality" of an expert's medical conclusions with the "informality" of the factual background material the expert relied on in reaching those conclusions. It is well-established that "[a]n expert witness . . . may base an opinion on reliable hearsay, including out-of-court declarations of other persons." (*In re Fields* (1990) 51 Cal.3d 1063, 1070.) Thus, in *People v. Shattuck* (1895) 109 Cal. 673, where a defense medical expert testified

---

[6] "[A] five justice majority of the high court and at least six of the seven justices on the California Supreme Court appear to agree that, for purposes of the confrontation clause, out-of-court statements admitted as basis evidence during expert testimony are admitted for their truth if treated as factual by the expert and, thus, implicate confrontation rights if the statements are testimonial." (*People v. Westmoreland, supra,* 213 Cal.App.4th at p. 623, fn. omitted.)

the defendant's brain tumor had rendered her liable to become insane if she were greatly excited, the trial court was found to have erred by precluding the expert from giving a clinical history of the case because that history had come from the defendant herself. Noting the expert had testified it was " 'necessary to refer to [her] previous condition in order to explain why I treated her, and why I came to the conclusion,' " our Supreme Court held: "Such declarations and statements, when they constitute in part the basis upon which the opinion of an expert is based, and are by him declared to be necessary to enable him to form an opinion as to the nature of the disease, are admissible. [Citations.]" (*Id.* at pp. 678-679.) Here, the extra-judicial witness statements relayed to Chinwah by the coroner's investigator constituted factual information that Chinwah relied on in reaching his "official conclusion" about the manner of death.

Hence, we conclude the extra-judicial statements Chinwah relied on in reaching his "homicide" determination did not qualify as testimonial because they failed both the formality and the primary purpose tests. That is, we conclude there was no confrontation clause violation under either the *Williams* plurality or Justice Thomas's *Williams* concurrence. Certainly the extra-judicial statements of the coroner's investigator would not qualify under Justice Thomas's "formality" test because they were "not the product of any sort of formalized dialogue resembling custodial interrogation." (*Williams v. Illinois, supra,* 132 S.Ct. at. p. 2260, fn. omitted (conc. opn. of Thomas, J.).) Indeed, those statements were apparently gleaned from a very informal interview process conducted by the coroner's investigator. And given *Dungo*'s conclusion that criminal investigation is not the primary purpose for preparing an autopsy report, the disputed evidence here would also fail the plurality's "primary purpose" test.

There was no *Crawford* error.

(2) *Any* Crawford *error was harmless.*

Moreover, even assuming arguendo there was *Crawford* error, we conclude the error was undoubtedly harmless.

In *People v. Pearson* (2013) 56 Cal.4th 393, our Supreme Court resolved a *Crawford* autopsy report issue by skirting the substantive constitutional claim because it was apparent any error was harmless: "[W]e need not decide whether, following our decision in *Dungo*, the evidence here is testimonial because any error in the admission of the autopsy reports and Dr. Peterson's testimony was harmless beyond a reasonable doubt. [Citations.] [¶] 'The beyond-a-reasonable-doubt standard of *Chapman*[7] "requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." [Citation.] "To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." [Citation.] Thus, the focus is what the jury actually decided and whether the error might have tainted its decision. That is to say, the issue is "whether the . . . verdict actually rendered in this trial was surely unattributable to the error." [Citation.]' [Citation.]" (*People v. Pearson, supra,* at p. 463; see also *People v. Rutterschmidt, supra,* 55 Cal.4th at p. 661 ["Violation of the Sixth Amendment's confrontation right requires reversal of the judgment against a criminal defendant unless the prosecution can show 'beyond a reasonable doubt' that the error was harmless."].)

Mercado argues any error must have been prejudicial because: (a) the evidence "went to the heart of the case and consisted of expert opinion that, essentially, Ms. Mercado was guilty of homicide and that her defense was a 'story' "; (b) the prosecutor urged the jury to consider this evidence; and, (c) the evidence "stood out because it was presented through the testimony of an expert who

---

[7] *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705].

27

unequivocally vouched for the credibility of the out-of-court declarants." We are not persuaded.

To show how the prosecutor "urged the jury to consider this evidence," Mercado points to this portion of the prosecutor's closing argument: "[Dr. Chinwah f]ound the cause of death to be blunt force trauma. [¶] He said that that was consistent with the car running over the mother while the baby was in the womb, what we know happened. The manner of death is homicide. [¶] He told us he had five choices, one of them being accident. And he chose homicide. [¶] And [defense] counsel cross-examined him pretty extensively on that. He said it took massive force to create this amount of injury. The various scenario[s] and sort of hypotheticals that the defense attorney tried to give do not correspond to the injuries the doctor saw. [¶] The information he received from the coroner's investigator was so convincing and compatible with the findings. I'm not telling you to convict her of murder because the coroner said it's homicide, but it's something you should take into consideration."

But this entire argument took up barely half a page of reporter's transcript out of a total prosecution closing argument of about 35 pages. And, as the Attorney General points out, "the prosecutor specifically argued to the jury that it could *not* convict appellant of murder just because Dr. Chinwah said it was homicide." (Italics added.) We find this single, fleeting reference to the matter during closing argument to have been inconsequential.

Contrary to Mercado's assertion, Chinwah did not actually vouch for the eyewitnesses' credibility. Indeed, he testified he had no idea whom the investigator had interviewed. Mercado argues Chinwah vouched for their credibility when he testified "the information that I got was so convincing and compatible to the finding that all the other information to me would be, maybe making up a story." But this suggestion, that Chinwah's use of the word "story" somehow demonstrates he was automatically prepared to denigrate any contrary information, is meritless. Chinwah also described the information he received from the coroner's investigator as "the original *story* on this thing here." (Italics added.)

28

Moreover, given Chinwah's acknowledgment that his *cause of death* finding was compatible with the *manner of death* having been either homicide or accident, and that he did not actually know whether the driver had intentionally hit the baby's mother, awareness of the extra-judicial statements could not have affected the jury's verdict. As Mercado herself acknowledges: "This hearsay formed the sole basis of Chinwah's opinion that the manner of death was homicide. (Dr. Chinwah acknowledges that the skull fracture suggesting blunt force trauma could have been caused either by an intentional striking of Davis with the vehicle, or by an accidental striking of Davis with the vehicle.) *As a matter of common sense and logic as well, it is implausible that an autopsy could reveal whether the defendant had accidentally or deliberately struck a person with her vehicle.*" (Italics added) Regardless of whether Mercado's final assertion would hold true in every conceivable situation, we agree it was certainly true in this case that the jury would have realized the autopsy procedure was not going to answer the question whether she ran over Davis intentionally or accidentally.

What did answer that question was the overwhelming evidence showing Mercado intentionally struck Davis with her car. Waller's initial trial testimony was a transparent attempt to exculpate Mercado for personal reasons. By the end of his testimony, Waller acknowledged he had heard Mercado threaten to kill Davis just prior to driving the Range Rover right toward her, and that it was clear Mercado had struck Davis intentionally.

But the most damning testimony probably came from the two entirely independent eyewitnesses. Bruce Cotton testified he saw Mercado turn around, head back toward Davis and stop right in front of her. He saw Davis put her hand on the hood of the car and he heard Waller yell, "No, no, don't do it. Don't do it. Stop, don't do it." Mercado then "hit the accelerator" and rolled slowly over Davis. The car did not swerve or brake. Jai Gilyard testified she heard someone in the car, a person who logically could only have been Mercado, say: "If you don't get from in front of my car, I'm going to run you over." The witness statements collected by the

coroner's investigator at most merely corroborated the testimony of Cotton and Gilyard.[8]

In addition, there was evidence of a long feud between Mercado and Davis over Waller's affections, and evidence that once before, in January 2009, Mercado had tried to run down Davis but she managed to jump out of the way because Waller yelled out a warning. There was also evidence of Mercado's past violent conduct in connection with Waller's other girlfriends, which included a November 2007 incident in which Mercado tried to drive a car into Saraya Hollis.

In the face of this overwhelming evidence of Mercado's guilt, the exclusion of Dr. Chinwah's testimony, that he concluded the baby's "manner of death" had been homicide based on information received from the coroner's investigator, would not have changed the verdict. (See *People v. Pearson, supra,* 56 Cal.4th at p. 463.)[9]

4. *There was no cumulative error.*

Mercado contends her convictions must be reversed for cumulative error. Because we have found at most one possible error, her claim of cumulative error fails. (See *People v. Vieira* (2005) 35 Cal.4th 264, 305 [where only one harmless error at penalty phase, cumulative evidence claim was without merit].)

5. *Sentencing error must be corrected.*

Mercado contends, and the Attorney General properly concedes, the trial court erred by imposing enhancements on count 2 (the attempted murder of Davis) for *both* the infliction of great bodily injury (§ 12022.7) *and* the infliction of injury on a pregnant woman resulting in the termination of her pregnancy (§ 12022.9).

Section 12022.7, subdivision (a), provides: "Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission

---

[8] It also appears that, in all probability, the coroner's investigator spoke to the same two independent eyewitnesses who testified at trial.

[9] Given this result, the related claim raised in Mercado's habeas corpus petition is denied.

of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years."

Section 12022.9 provides, in pertinent part: "Any person who, during the commission of a felony or attempted felony, knows or reasonably should know that the victim is pregnant, and who, with intent to inflict injury, and without the consent of the woman, personally inflicts injury upon a pregnant woman that results in the termination of the pregnancy shall be punished by an additional and consecutive term of imprisonment in the state prison for five years."

Section 1170.1, subdivision (g) provides, in pertinent part: "When two or more enhancements may be imposed for the infliction of great bodily injury on the same victim in the commission of a single offense, only the greatest of those enhancements shall be imposed for that offense."

Because section 12022.9 punishes the infliction of bodily injury upon a victim who happens to be pregnant,[10] both it and section 12022.7 punish the infliction of great bodily injury. (See § 12022.53, subd. (f) [referring to "enhancement for great bodily injury as defined in Section 12022.7, 12022.8, or 12022.9"]; *People v. Pieters* (1991) 52 Cal.3d 894, 901 [referring to sections 12022.7 and 12022.9 as enhancements for "infliction of great bodily injury".) However, section 1170.1, subdivision (g), provides, in pertinent part: "When two or more enhancements may be imposed for the infliction of great bodily injury on the same victim in the commission of a single offense, only the greatest of those enhancements shall be imposed for that offense." Hence, we will order stricken the three-year enhancement under section 12022.7.

_____

[10]    See *People v. Taylor* (2004) 119 Cal.App.4th 628, 644 ("[*People v.*] *Dennis* [(1998)] 17 Cal.4th 468, teaches that the point of the enhancement is to punish the defendant for injuring a woman in a particular manner with a particular result, not for the particular harm that comes to the fetus she is carrying.").

## DISPOSITION

The three-year sentence enhancement under section 12022.7 is stricken. As modified, the judgment is affirmed. The clerk of the superior court is directed to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment. The habeas corpus petition is denied.

**CERTIFIED FOR PUBLICATION**

KLEIN, P. J.

We concur:

CROSKEY, J.

ALDRICH, J.