Filed 2/25/14  P. v. Robles CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B232828 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA059334) |
| v. | |
| DAVID ROBLES et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Sam Ohta, Judge.  Affirmed.

Sara H. Ruddy, under appointment by the Court of Appeal, for Defendant and Appellant David Robles.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant Jesse Garcia.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Blythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants David Robles and Jesse Garcia appeal their convictions for murder and attempted murder. Robles was sentenced to life in prison without the possibility of parole, plus 39 years to life. Garcia was sentenced to life in prison without the possibility of parole, plus 178 years to life. Appellants contend the trial court made various evidentiary errors. Discerning no prejudicial error, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

## I. *Facts.*[1]

a. *People's evidence.*

(i) *Background information.*

Appellants Robles and Garcia are cousins. In 1998, Robles was a member of the Lennox 13 criminal street gang, who went by the moniker "Puppet." Garcia was an active member of the Culver City Boys street gang, who went by the moniker "Psycho." Robles and Garcia lived together.

Frank Ernest Juarez (Frank)[2] and Arturo Arce were co-owners of the Westside Clothing Store, located at 2204 Lincoln Boulevard in Santa Monica. Arce was a member of the Santa Monica 17 gang, who used the moniker "Termite."

(ii) *The October 27, 1998 shootings.*

On October 27, 1998, Frank was at the store preparing for its upcoming grand opening. With him were his cousins, Michael Juarez (Michael) and Anthony Juarez (Anthony), and an acquaintance, Matt Vaughn. Just before noon, three masked men entered the store and fired multiple rounds. Frank was alerted to the shooting when Vaughn ran to the back of the store, terrified. Frank saw one of the men wearing a black mask and carrying a long gun enter the store through the front door. The men began

---

[1] We discuss additional evidence *post*, where relevant to the issues presented on appeal.

[2] For ease of reference, and with no disrespect, we hereinafter sometimes refer to members of the Juarez family by their first names.

shooting multiple rounds randomly. Frank ran to shelter in the back office, where he heard rapid gunfire. The gunmen then fled to a waiting car.

When the shots stopped, Frank grabbed his pistol and went to the front of the store to find Michael lying on the ground. He had been shot 13 times, and died of multiple gunshot wounds. Anthony, who had suffered five gunshot wounds, was still breathing but died minutes later. Vaughn and Frank were both wounded, but survived.

Aimee Phelps, her then-husband Jason Morse, Glenn Commans, Eric Huffine, Robert Mook, and Rick Heltzer were all waiting in their vehicles in the drive-through line of a Taco Bell restaurant located across the street from the clothing store. They all heard multiple gunshots fired in rapid succession at the store. They saw three men, wearing long coats and carrying long guns, exit the store and run to a waiting green or blue-green car, which sped away after they entered. Robles was later identified as the driver. One of the men, later identified as Garcia, removed a ski mask or cap, which fell to the ground just outside the store. Heltzer followed the getaway car for some distance, and recorded a partial license plate number. Commans also wrote down a portion of the getaway car's license plate number.

Phelps and Morse ran into the store to assist the victims. Phelps and Frank prayed with Anthony as he died.

(iii)    *Discovery of the getaway car.*

At approximately noon on October 27, 1998, high school student Janine Gertsch left school early to wash her car, which had been egged during homecoming festivities. She saw two Hispanic men drive up in a green Dodge Neon automobile, and park in front of her home in El Segundo. The men exited the car and walked down the street. One had a tattoo on his neck. The next day, the car was still parked in front of the house. Gertsch looked inside and observed that the ignition had been "punched." She alerted police, who

determined that the registered owner of the Neon was a rental car company. At trial, Gertsch identified Robles as the Neon's driver.[3]

       (iv)    *Arrest of Robles and Garcia on October 28, 1998 on unrelated charges.*

On the day after the shooting, October 28, 1998, police executed a search warrant at Robles's and Garcia's residence in connection with an October 9, 1998 home invasion robbery in which Garcia was a suspect (see *post.*) Robles, Garcia, and Rudy Renteria were present. Both Robles and Garcia were arrested on charges unrelated to the shooting, convicted, and sentenced to prison.

       (v)    *Forensic investigation.*

Police recovered the knit cap that had been dropped at the crime scene. Three holes had been cut in the cap, apparently for the wearer's eyes and mouth. In 2002 and 2004, respectively, testing revealed the presence of Robles's and Garcia's DNA on the cap. DNA on the cap had been contributed by at least three, and possibly as many as five, persons. The identity of the other contributor(s) was undetermined.

       (vi)    *Eyewitness identifications.*

Based on Phelps's description of the driver, a police artist prepared a composite sketch, which resembled Robles. Following the DNA testing, in 2006 and 2007 police contacted the witnesses who had been in the Taco Bell line to attempt to identify the assailants. Commans identified Garcia in a live lineup, at the preliminary hearing, and at trial. He also identified Garcia and another man in a pretrial six-pack photographic lineup. He was positive about his identification of Garcia at trial. Phelps selected Robles as one of the assailants in a photographic lineup, and identified him at trial as the driver.

---

[3]    When Gertsch testified at appellants' first trial, she did not state that she had seen the car and its occupants arrive. Instead, she testified she had come home from school between 3:00 and 4:00 p.m. and the car was already parked in front of her house. She never told anyone she could recognize the driver until shortly before she testified at the second trial. When asked why she failed to reveal this information during the prior 13 years, she testified that she was worried about getting in trouble because she was not supposed to be out of school, and no one asked her if she had seen anyone get out of the car.

Morse was unable to identify either appellant in court, but identified Robles in a pretrial photographic lineup based on his resemblance to the sketch. Heltzer identified Robles and Garcia in photographic lineups in 2007, but equivocated regarding which was the driver. At a live lineup, he identified Robles and another subject as resembling the driver. He positively identified Robles as the driver at trial.

(vii) *Evidence regarding criminal street gangs and the Mexican Mafia.*

The People introduced the testimony of three experts on gangs and drug trafficking at trial. In addition to the gang evidence briefly discussed *ante,* they testified as follows.

A. *Albert Casillas.*

Albert Casillas, a Culver City police officer, testified regarding the Culver City Boys criminal street gang.[4] In 1998, the gang had over 300 members, and its primary activities were narcotics sales, murder, and robberies. The gang used storefronts to sell narcotics. In 1998, Garcia was a Culver City Boys gang member. At the time of trial, Garcia had a tattoo that read, " 'I'll ride for you CECE. We murderers[.]' " In October 1998, the Culver City Boys and the Santa Monica 17 gangs were embroiled in a gang feud. There were shootings between the two gangs, and in October 1998 a Culver City Boy was killed in Santa Monica. It is common for one gang to retaliate against another if one of its members is killed. The Culver City Boys and the Lennox 13 gangs were not gang rivals in October 1998, nor were they allied.

B. *Richard Valdemar.*

Retired Los Angeles County Sheriff's Sergeant Richard Valdemar testified as an expert on the Mexican Mafia. The Mexican Mafia is a covert criminal organization that operates in prison and controls the day-to-day activities of Hispanic street gangs. It is allied with drug cartels from Mexico and Colombia and requires the payment of "taxes" from drug dealers in its territory. Mexican Mafia leaders in prison designate street gang members to conduct their drug sale business. The gangs are responsible for contacting

---

[4] The gang was known as both the "Culver City Boys" and the "Culver City 13."

local drug sources, who are often cartel members, and procuring drugs from them. The designated gangs are then responsible for distributing the drugs throughout the community, ensuring safe delivery and payment. "Taxer[s]" or "enforcer[s]" appointed by the organization are responsible for collecting approximately one-third of the profits from gangs' drug sales. Mexican Mafia members in prison have means of communicating with persons outside prison.

The Mexican Mafia promulgates a code of conduct that must be followed by inmates and gang members. Gang members are prohibited from informing on other gang members, divulging the secrets of their organization, or displaying weakness or cowardice. They are to attack rivals and represent their neighborhood even when outnumbered. The organization disciplines persons who do not follow their rules by attacking and seriously injuring or killing them. Street gang members volunteer to "put in work" for the Mexican Mafia in hopes of being invited to join the organization. Such work may include committing murders on behalf of the Mexican Mafia.

The Mexican Mafia issued a variety of edicts which street gang members were required to follow. One was a prohibition on drive-by shootings. Group leaders determined that drive-by shootings result in innocent people being killed or wounded, which results in bad publicity and a higher police presence. At meetings in 1998, this principle was reiterated. The Mexican Mafia required that gang members exit their car and approach the intended victim on foot, shooting them directly, possibly in the head, to "be sure of killing without injuring innocent people." The Mexican Mafia's "signature method" of execution of an individual, however, was "[o]verkill. That is where one or two shots might be terminal. The Mexican Mafia, to show, again, an example, actually establish a terrorist-type feeling in the street, will over-shoot the person, almost a ritualistic shooting, and often including head shots." The Mexican Mafia sometimes uses three-man, or four-man teams to commit such a killing.

If an individual or gang in the Mexican Mafia's jurisdiction failed to pay taxes, a "hit list would be generated, referred to as a green light list, and the surrounding gangs would be given permission, or a green light, to attack members of that gang and kill

6

them, if possible." Written green light lists were generated by Mexican Mafia members in prison, who would then circulate the lists in the prison system and notify representatives on the street, who would get the word out. Either a whole gang or individual gang members could be placed on a green light list. Individuals placed on such lists were known as "hard candies," and were "marked for special attention and murder." Such lists were typically written down and duplicated for distribution to multiple gangs.

In 1998, the Mexican Mafia used Westside criminal street gangs under its control to control a portion of the Los Angeles narcotics trade. The Culver City Boys, the Lennox 13, and the Santa Monica gangs were aligned with and controlled by the Mexican Mafia. Hector Marroquin, or "Weasel," was the Mexican Mafia's representative on the street in West Los Angeles. Marroquin was responsible for collecting taxes, enforcing the Mexican Mafia's rules, and dealing with "green light" lists. The Lennox 13, Santa Monica, and Culver City gangs were under Marroquin's control and answered to him. In Valdemar's opinion, a Santa Monica 17 gang member who was a significant distributor of narcotics would be taxed. If he did not pay, he would be placed on a green light list and "made an example of."

"Termite from Santa Monica" was on a green light list confiscated in 1999 from a Mexican Mafia member who was incarcerated. Two more green light lists containing Termite's name were confiscated from inmates. One was dated February 2000; the other was confiscated in September 1999.[5] Valdemar opined that "Termite from Santa Monica" was Arce, a gang member. Arce was the only "Termite" Valdemar was aware of in the Santa Monica area gangs. In Valdemar's opinion, the green light lists authorized the Westside Clothing shooting.

Gangs do not ordinarily cooperate in joint operations with other gangs, but they will act together when ordered to do so by the Mexican Mafia.

---

[5] The People presented the testimony of the officers who confiscated these lists.

When given a hypothetical based upon the facts of the case, Valdemar opined that such a shooting would be consistent with a killing ordered by the Mexican Mafia.

In August 1998, Valdemar met with Vito Medina of the Lennox 13 gang. This was their only meeting. The Lennox 13 gang was on a 1998 green light list because of its failure to cooperate with Marroquin.

### C. *Stephen Diederich.*

Stephen Diederich was a supervisory special agent with the Unites States Drug Enforcement Administration (DEA).[6] Much of his testimony overlapped with Sergeant Valdemar's. In 1998, he was assigned to the DEA's Los Angeles field office, which was at that time targeting Mexican drug cartels. In late 1997 Vito Medina, a member of the Lennox 13 gang with the moniker "Capone," contacted the Los Angeles DEA office and offered his services as an informant. Medina was an "original gangster" and a "shot-caller," that is, a higher-echelon, older member of the gang. From December 1997 to April 1999, Medina supplied information to Diederich regarding the narcotics trafficking activities of the Martinez family, the distribution of narcotics to gangs, and the activities of the Mexican Mafia and the Lennox 13 gang. Medina's information resulted in the seizure of evidence and convictions. The DEA paid Medina approximately $4,000 for his services.

Using an organizational chart supplied by Medina, Diederich testified regarding the Mexican Mafia's control of drug dealing activities in West Los Angeles. Diederich explained that top Mexican Mafia leaders in prison would issue orders "down through the prison system" and out to spokespersons on the outside. Mexican Mafia representative Hector Marroquin, known as "Weasel," was in charge of "collecting taxes, issuing green lights, discipline" in the Westside Los Angeles area. A " 'green light' " is an order to kill someone. A "tax" is protection money, that is, monies paid to the Mexican Mafia for the privilege of continuing to sell narcotics. The Mexican Mafia had given permission for the Martinez family, based in Hawthorne, to distribute substantial quantities of narcotics

---

[6]     We discuss Diederich's testimony, and the basis for it, in more detail *post.*

to various Westside Los Angeles gangs, including, inter alia, the Lennox 13, Culver City, and Santa Monica gangs. In exchange, the gangs were required to pay "taxes" to a Mexican Mafia representative for the privilege of trafficking the drugs. The Lennox 13 gang paid its taxes to Marroquin. Medina was one of the Lennox 13 gang's liaisons with Marroquin, and was responsible for paying the gang's taxes and attending meetings called by Marroquin.

"Green light" is a term commonly used by the Mexican Mafia and other gangs. A green light is "an order it's okay to place a hit, to murder somebody, generally a rival." The Mexican Mafia, operating through its spokespersons, would authorize the placement of a person on a green light list. A person who failed to follow the Mexican Mafia's rules would be placed on a "green light" list, authorizing his or her murder, and would likely be killed. Assassins carrying out the hit would not commit a drive-by shooting, but instead would exit their vehicle and shoot the victim in the head. A Lennox 13 gang member would be expected to know this procedure. In 1998, Medina was on a green light list. He was shot in September 1998, and died of his injuries in April 1999.[7]

During his investigation, Diederich learned of a Santa Monica gang member with the moniker "Termite," who was a significant distributor of cocaine.

(viii) *Arturo Arce's testimony.*

Arce denied being a Santa Monica 17 gang member or using the moniker "Termite."[8] After the murders, no one had tried to kill him.

(ix) *Garcia's tattoo.*

When Garcia was arrested on October 28, 1998, he had a tattoo on his neck with the letters "CECE." Sometime thereafter, Garcia had an additional tattoo added, reading

---

[7] Appellant Robles was convicted of voluntary manslaughter for killing Medina. The jury was not informed of this fact.

[8] The trial court found Arce was unavailable as a witness due to his invocation of his Fifth Amendment privilege against self-incrimination. Accordingly, his former testimony was read into the record.

9

" 'I'll ride for you CECE.  We murderers.' "[9]  While anyone could obtain such a tattoo, a gang member who did so would likely be disciplined by his own gang if he had not, in fact, participated in a murder.

        (x)    *Jailhouse informer.*

In 2006, Robert Kube was in custody in a Los Angeles County jail facility, awaiting trial on robbery charges.  Robles arrived at the jail from Corcoran.  According to Kube, Robles told Kube that he was the driver in homicides committed in 1998.  Subsequently, Garcia arrived at the jail from Ironwood State Prison.  According to Kube, Garcia stated that he was in custody for two murders and two attempted murders.  He said he had been sent to commit the shootings by the "big homies," and that the shootings had involved a dispute over money.  Garcia stated that four men were involved and the shootings occurred at a store on Lincoln Boulevard in Santa Monica.  Garcia stated that he was worried a witness who had been at the Taco Bell could identify him.  He was also concerned that he had inadvertently dropped a cap with holes cut from it at the crime scene.

        (xi)    *October 9, 1998 home invasion robbery.*

Approximately two weeks prior to the Westside Clothing Store shootings, on the afternoon of October 9, 1998, Kammellia Tadayon and her friend Laurie returned to Tadayon's Los Angeles apartment after going out to lunch.  Using a ruse, Garcia and another man, "Marco," obtained entry to her apartment.  Garcia had a large, black gun that resembled a machine gun, and was between 18 to 20 inches long.  He pointed it at Tadayon and Laurie.  Both men said, " 'I know you've been selling narcotics in our territory.  This is Mexican Mafia, Culver City Boys.' "  During the next several hours, the intruders searched the apartment, hog-tied Tadayon, put a knife to her throat, and demanded $10,000.  Laurie and Tadayon unsuccessfully attempted to obtain money from relatives and friends.  When the women were unable to pay, Garcia and the other man forced Tadayon to write a letter stating she was giving Garcia her car.  Garcia and the

---

**9**       "CECE" stands for the Culver City Boys gang.

other man then left in Tadayon's car, taking Laurie as a hostage. Tadayon called police, who recovered Laurie and the car shortly thereafter.

   b.   *Garcia's defense.*

Garcia's defense was mistaken identity. He was 5 feet 4½ inches tall. Eyewitnesses Huffine, Mook, and Heltzer had told police the assailant they saw was between 5 feet 9 inches and six feet tall.

Garcia also presented the testimony of an identification expert, Mitchell Eisen. Among other things, Eisen testified that distraction resulting from multiple visual targets, a delay between the event and the identification, and "carryover" effects after seeing a suspect's face repeatedly during identification procedures or in court, could all decrease the accuracy of an identification.

James Esten, an expert on the conditions of confinement in state prison, testified that Kube could have received benefits from early work assignments and being housed in protective housing, even if he did not receive a reduction in sentence.

Rudy Renteria, who was Garcia's brother and lived with Garcia and Robles prior to their arrests, testified that the three men routinely worked out in the late morning in their garage and wore beanies in cold weather. The caps they wore resembled the one dropped at the crime scene, minus the holes.

   c.   *Robles's defense.*

Robles's defense was primarily aimed at showing the shooting was not an execution ordered by the Mexican Mafia, but was instead the result of an ongoing gang war between the Culver City Boys and the Santa Monica 13 gangs. As discussed in more detail *ante,* Robles presented evidence regarding the gang feud going on between the two gangs in October 1998.

Frank testified that he did not know Arce to use the moniker "Termite." Another man, Felix Munoz, used that name, however.

Detective Bambrick testified that, in 2009, there were two other persons in Santa Monica who went by the name "Termite." However, he knew of no other Santa Monica gang members with that moniker.

d.    *People's rebuttal.*

Kube's prison records revealed that he did not receive any special treatment or benefits while in prison, and his custody credits were unaffected by his work assignment, or lack thereof.

## II.    *Procedure.*

Robles and Garcia were tried twice. Their first trial, in 2009, ended in a mistrial after the jury deadlocked. In the second jury trial in 2011, appellants were convicted of the first degree murders of Michael and Anthony, and the attempted willful, deliberate, and premeditated attempted murders of Frank and Vaughn. (Pen. Code, §§ 664, 187, subd. (a).)[10] As to appellant Garcia, the jury found that a principal personally and intentionally used and discharged a firearm during commission of all the offenses, causing great bodily injury or death (§ 12022.53, subds. (b), (c) & (d).) As to both appellants, the jury found a multiple murder special circumstance true. In a bifurcated proceeding, the trial court found Garcia had suffered a prior "strike" conviction.

The trial court sentenced Robles to life in prison without the possibility of parole, plus 39 years to life. It sentenced Garcia to life in prison without the possibility of parole, plus 178 years to life. The court imposed restitution fines of $10,000 and $5,000 on Garcia and Robles, respectively, as well as court security assessments and criminal conviction assessments. Robles and Garcia appeal.

DISCUSSION

## I.    *Admission of Agent Diederich's expert testimony.*

a.    *Additional facts.*

Prior to trial, appellant Robles objected to admission of Agent Diederich's testimony on the grounds it was inadmissible hearsay, violated the Sixth Amendment's Confrontation Clause, and was irrelevant. Robles argued that most of Diederich's

---

[10]    All further undesignated statutory references are to the Penal Code.

information came from Medina, who was not available as a witness,[11] and Diederich could not simply restate what Medina had told him in the guise of expert opinion.

The trial court conducted an Evidence Code section 402 hearing at which Diederich testified regarding the substance of his proposed testimony. Diederich detailed his substantial training and experience, which he reiterated in his trial testimony.[12] He explained that most of his information had come from Medina, and he had corroborated some, but not all, of it by other means, such as discussions with other law enforcement agents, evidence seized in searches, or further DEA investigation.

The trial court ruled, pursuant to *People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*), that Diederich could testify as an expert regarding only the following topics: (1) whether "Termite" was involved in the distribution of narcotics; (2) the manner and extent of the Mexican Mafia's control over the distribution of narcotics; (3) the illegal narcotics distribution hierarchy on the Westside of Los Angeles in 1998; and (4) the consequences of distributing narcotics in violation of the Mexican Mafia's rules. The court excluded substantial portions of Diederich's Evidence Code section 402 hearing testimony in order to prevent the jury from learning of incompetent hearsay. It explained that Diederich could not act as a pass-through for Medina's statements, or parrot what

---

[11]    Although Medina was unavailable as a witness only because Robles killed him, under current United States Supreme Court authority this fact does not prevent Robles from asserting a confrontation claim. Although *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) accepted that the "rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds" (*id.* at p. 62), the high court has since ruled that the doctrine only applies where the defendant killed the witness in order to prevent him or her from testifying. (*Giles v. California* (2008) 554 U.S. 353, 359-361, 368; see also *People v. Mai* (2013) 57 Cal.4th 986, 1039-1040, fn. 21; *People v. Streeter* (2012) 54 Cal.4th 205, 240.) Since there is no showing Robles committed the killing to prevent Medina from testifying, the forfeiture by wrongdoing doctrine does not apply. The People do not argue otherwise.

[12]    Among other things, Diederich had been an agent with the Department of Justice for 20 years; had completed a 14-week live-in academy course which included instruction on narcotics investigations of drug-trafficking organizations; and had investigated numerous drug trafficking cases in a variety of contexts.

13

Medina had told him; however, he could form opinions based on his conversations with Medina.

      b.     *Discussion.*

Robles, joined by Garcia, contends the trial court's ruling was error. Appellants urge Diederich's testimony violated the Confrontation Clause because it was based on testimonial hearsay provided by Medina, an unavailable witness who had not been cross-examined.

      (i)     *Applicable legal principles*

The Sixth Amendment to the United States Constitution gives a criminal defendant the right to confront and cross-examine adverse witnesses. (*People v. Lopez* (2012) 55 Cal.4th 569, 573, 576 (*Lopez*).) In the seminal case of *Crawford*, *supra*, 541 U.S. 36, the court overruled its prior precedent and held that the Sixth Amendment generally bars admission at trial of a testimonial out-of-court statement offered for its truth against a criminal defendant, unless the maker of the statement is unavailable to testify and the defendant had a prior opportunity for cross-examination. (*Id.* at p. 69; *Davis v. Washington* (2006) 547 U.S. 813, 821; *People v. Livingston* (2012) 53 Cal.4th 1145, 1158; *Lopez,* at pp. 573, 580-581.) Although *Crawford* set forth a new standard for admissibility, the court declined to provide a comprehensive definition of "testimonial." (*Crawford,* at p. 68; *People v. Cage* (2007) 40 Cal.4th 965, 969; *People v. Hill* (2011) 191 Cal.App.4th 1104, 1134.) *Crawford* did make clear that the Confrontation Clause does not apply to out-of-court statements not offered for their truth. (*Crawford,* at p. 60, fn. 9; *People v. Ervine* (2009) 47 Cal.4th 745, 775-776; *People v. Valadez* (2013) 220 Cal.App.4th 16, 30 (*Valadez*); *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1210.)

We review the trial court's admission of expert testimony for abuse of discretion. (*Valadez, supra,* 220 Cal.App.4th at p. 29; *People v. Hill, supra,* 191 Cal.App.4th at p. 1122.) Whether evidence was admitted in violation of the Confrontation Clause is subject to independent review. (*People v. Seijas* (2005) 36 Cal.4th 291, 304; *People v. Sweeney* (2009) 175 Cal.App.4th 210, 221.)

(ii)    *Was Diederich's expert testimony about Medina's statements admissible because it was not offered for its truth?*

It has long been the law in California that gang experts may rely on reliable hearsay in forming their opinions, even if the evidence would otherwise be inadmissible. (Evid. Code, § 801, subd. (b);[13] *Gardeley, supra,* 14 Cal.4th at pp. 617-618 [gang expert's testimony may be premised on inadmissible material, including reliable hearsay]; *Valadez, supra,* 220 Cal.App.4th at p. 29; *People v. Hill, supra,* 191 Cal.App.4th at p. 1122; *People v. Ramirez* (2007) 153 Cal.App.4th 1422, 1426-1427; *People v. Sisneros* (2009) 174 Cal.App.4th 142, 153.)  A gang expert's sources can include, inter alia, written material, conversations with gang members, information learned from colleagues or other law enforcement agencies, and the expert's personal investigation of gang-related crimes.  (*Valadez*, at p. 29; *Hill, supra,* at pp. 1121-1122; *People v. Vy* (2004) 122 Cal.App.4th 1209, 1223, & fn. 10; see, e.g., *People v. Sengpadychith* (2001) 26 Cal.4th 316, 324; *Gardeley,* at p. 620.)

Because Evidence Code section 802 allows an expert witness to " 'state on direct examination the reasons for his opinion and the matter . . . upon which it is based,' an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion." (*Gardeley, supra,* 14 Cal.4th at p. 618; *People v. Montiel* (1993) 5 Cal.4th 877, 918; *People v. Thomas, supra,* 130 Cal.App.4th at pp. 1209-1210.)  An expert's recitation of sources relied upon for his or her opinion "does not transform inadmissible matter into 'independent proof' of any fact." (*Gardeley, supra,* at p. 619.)  "[P]rejudice may arise if, ' "under the guise of reasons," ' the expert's detailed explanation ' "[brings] before the jury incompetent

---

[13]    Evidence Code section 801, subdivision (b) provides that an expert's opinion may be based on "matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

hearsay evidence." ' [Citations.]" (*People v. Montiel, supra*, at pp. 918-919; *People v. Cooper* (2007) 148 Cal.App.4th 731, 747.)  Thus, both before and after *Crawford*, an expert was and is not allowed to simply parrot the testimony of an out-of-court witness under the guise of expert testimony.

California appellate courts after *Crawford* repeatedly have held that the admission of testimonial out-of-court statements or other hearsay evidence offered as the basis for an expert's opinion ("basis evidence") does not violate *Crawford*.  (See *Valadez, supra,* 220 Cal.App.4th at p. 30 [listing cases]; *People v. Thomas, supra,* 130 Cal.App.4th at pp. 1209-1210; *People v. Cooper, supra,* 148 Cal.App.4th at pp. 746-747; *People v. Ramirez, supra,* 153 Cal.App.4th at pp. 1426-1427; *People v. Sisneros, supra,* 174 Cal.App.4th at pp. 153-154.)  For example, *Thomas* reasoned:  "*Crawford* does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions.  This is so because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion.  *Crawford* itself states that the [C]onfrontation [C]lause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' [Citations.]" (*Thomas,* at p. 1210; see also *People v. Cooper, supra,* 148 Cal.App.4th at p. 747 ["Hearsay relied upon by experts in formulating their opinions is not testimonial because it is not offered for the truth of the facts stated but merely as the basis for the expert's opinion"]; *People v. Sisneros, supra,* 174 Cal.App.4th at p. 153.)

*People v. Hill, supra,* 191 Cal.App.4th 1104, questioned this reasoning.  It explained:  "Central to the reasoning in *Gardeley* and *Thomas* is the implied assumption that the out-of-court statements may help the jury evaluate the expert's opinion without regard to the truth of the statements.  Otherwise, the conclusion that the statements should remain free of *Crawford* review because they are not admitted for their truth is nonsensical.  But this assumption appears to be incorrect." (*Hill,* at pp. 1129-1130.)

16

Citing a New York case, *Hill* pointed out that a jury will often be required to determine the truth of the basis evidence in order to use it to evaluate the expert's opinion. (*Id.* at pp. 1130-1131; see *Valadez, supra,* 220 Cal.App.4th at p. 31.) While *Hill* disagreed with the reasoning in *Thomas*, the court concluded *Thomas'*s holding was based on binding California Supreme Court precedent, which it was required to follow. (*Hill*, at pp. 1127, 1131.) Moreover, in *Hill* the bulk of the challenged out-of-court statements were not testimonial, because they were comprised of consensual conversations with gang members and did not involve the investigation of particular crimes. (*Id*. at pp. 1135-1136; see *Valadez,* at p. 31.)

Subsequent to the decision in *Thomas,* the United States Supreme Court has issued a trio of opinions addressing the application of *Crawford* to expert scientific or forensic testimony. (*Melendez-Diaz v. Massachusetts* (2009) 557 U.S 305; *Bullcoming v. New Mexico* (2011) 131 S.Ct. 2705; *Williams v. Illinois* (2012) 132 S.Ct. 2221 (*Williams*). These decisions have left the law in a "muddled state." (*Lopez, supra,* 55 Cal.4th at p. 590 (dis. opn. of Lui, J.).) Our California Supreme Court has subsequently issued its own trio of cases interpreting these authorities, and addressing the constitutionality of a prosecution expert's testimony about forensic evidence contained in a report prepared by someone who did not testify at trial. (*Id*. at p. 573; *People v. Dungo* (2012) 55 Cal.4th 608; *People v. Rutterschmidt* (2012) 55 Cal.4th 650.) Based on *Williams* and *Dungo,* it appears that, at least when scientific or forensic expert testimony is at issue, "a majority of justices on both the United States Supreme Court and our high court have indicated expert basis evidence is offered for its truth and subject to the confrontation clause." (*Valadez, supra,* 220 Cal.App.4th at p. 31; see *People v. Mercado* (2013) 216 Cal.App.4th 67, 89 & fn. 6.)

In *Williams, supra,* 132 S.Ct. 2221, the defendant was identified as the suspect in a rape after an Illinois police crime laboratory (ISP) matched his DNA profile, derived from a blood sample taken from him in an unrelated case, with a DNA sample derived by Cellmark Diagnostics Laboratory from semen found on vaginal swabs taken from the rape victim. At Williams's bench trial for rape, a state forensic analyst testified that she

had developed a DNA profile from the defendant's blood sample. Sandra Lambatos, a forensic expert, testified that she had compared the DNA profile derived from the blood sample with that produced by Cellmark from the swabs, and determined that the DNA profiles matched. (*Id.* at pp. 2230.) Lambatos testified that shipping manifests showed the swabs had been sent to Cellmark, and that Cellmark had sent them back with the male DNA profile. (*Ibid.*) The Cellmark report containing the DNA profile was not introduced into evidence, and no analyst from Cellmark testified. (*Id.* at p. 2230.) Lambatos testified that she did not conduct or observe any of the testing on the vaginal swabs, and that her testimony relied on the DNA profile produced by Cellmark. (*Id.* at p. 2230.) The Illinois Supreme Court affirmed Williams's conviction, concluding that Lambatos' testimony did not violate his confrontation rights, because the Cellmark report was not referenced to prove the truth of the matter it asserted, only to explain the basis for Lambatos' expert opinion. (*Williams, supra,* 132 S.Ct. at pp. 2231-2232; see *People v. Lopez, supra,* 55 Cal.4th at pp. 578-579.)

In a fractured four-one-four opinion, the Supreme Court held there was no Confrontation Clause violation, but a majority of the court could not agree on a rationale. (See *Williams, supra,* 132 S.Ct. at p. 2228; *Lopez, supra,* 55 Cal.4th at pp. 578-580; *People v. Barba* (2013) 215 Cal.App.4th 712, 727-728.) Justice Alito, in a plurality opinion joined by the Chief Justice and Justices Kennedy and Breyer, held that because the expert's testimony about the Cellmark report was not offered for its truth, its admission did not offend the Confrontation Clause. The plurality opinion explained: "[T]his form of expert testimony does not violate the Confrontation Clause because that provision has no application to out-of-court statements that are not offered to prove the truth of the matter asserted. When an expert testifies for the prosecution in a criminal case, the defendant has the opportunity to cross-examine the expert about any statements that are offered for their truth. Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not

offered for their truth and thus fall outside the scope of the Confrontation Clause." (*Williams, supra,* 132. S.Ct. at p. 2228.)**14**

However, the other five justices rejected the plurality's analysis on this point. Justice Thomas concurred with the result reached by the plurality solely because, in his view, Cellmark's statements lacked the requisite formality and solemnity to be considered testimonial. (*Williams, supra,* 132 S.Ct. at p. 2255 (conc. opn. of Thomas, J.).) Justice Thomas found the plurality's reasoning "flawed." (*Ibid.*) He perceived "no plausible reason for the introduction of Cellmark's statements other than to establish their truth." (*Id.* at p. 2256.) "[T]he validity of Lambatos' opinion ultimately turned on the truth of Cellmark's statements. The plurality's assertion that Cellmark's statements were merely relayed to explain 'the assumptions on which [Lambatos'] opinion rest[ed],' . . . overlooks that the value of Lambatos' testimony depended on the truth of those very assumptions." (*Id.* at p. 2258; see *Lopez, supra,* 55 Cal.4th at pp. 578-580.)

Justice Kagan's dissent, joined by Justices Scalia, Ginsburg, and Sotomayor, likewise rejected the plurality's reasoning, concluding that "Lambatos's statements about Cellmark's report went to its truth." (*Williams, supra,* 132 S.Ct at p. 2268 (dis. opn. of Kagan, J.).) In the dissent's view, the case was indistinguishable from *Melendez-Diaz*

---

**14**     The plurality offered a second, independent basis for its decision: the Cellmark report was "not prepared for the primary purpose of accusing a targeted individual." (*Williams, supra,* 132 S.Ct. at p. 2243.) "The Cellmark report is very different from the sort of extrajudicial statements, such as affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach. The report was produced before any suspect was identified. The report was sought not for the purpose of obtaining evidence to be used against petitioner, who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose." (*Id*. at p. 2228.) This rationale was rejected by Justice Thomas, who found it lacked any "grounding in constitutional text, in history, or in logic," (*id.* at p. 2262), and by the dissent. (*Id.* at pp. 2273-2274 (dis. opn. of Kagan, J.).)

and *Bullcoming*. (*Id.* at pp. 2265-2267.)[15] Justice Kagan reasoned that when an expert witness "repeats an out-of-court statement as the basis for a conclusion . . . the statement's utility is then dependent on its truth. If the statement is true, then the conclusion based on it is probably true; if not, not. So to determine the validity of the witness's conclusion, the factfinder must assess the truth of the out-of-court statement on which it relies. That is why the principal modern treatise on evidence variously calls the idea that such 'basis evidence' comes in not for its truth, but only to help the factfinder evaluate an expert's opinion 'very weak,' 'factually implausible,' 'nonsense,' and 'sheer fiction.' [Citation.]" (*Id.* at pp. 2268-2269.)

In *People v. Dungo, supra,* 55 Cal.4th 608, a forensic pathologist testified that the victim had been strangled. The pathologist's opinion was based on objective facts contained in an autopsy report completed by another pathologist, and accompanying photographs, which were not introduced into evidence. (*Id.* at p. 612.) As *Valadez* explained: "The majority opinion, written by Justice Kennard and joined by the Chief Justice and three other justices, concluded the statements in the autopsy report were not testimonial, and therefore not subject to the confrontation clause. [Citation.] That opinion did not address the hearsay issue, although it noted the *Williams* plurality's nonhearsay rationale. [Citation.] Justice Werdegar wrote a concurring opinion, however, which garnered majority support (joined by the Chief Justice and two other justices), explaining the statements in the report were offered for their truth, so they were subject to the confrontation clause. [Citation.] In dissent, Justice Corrigan, joined by Justice Liu, noted, 'When an expert witness treats as factual the contents of an out-of-court statement, and relates as true the contents of that statement to the jury, a majority of the high court

---

[15]    In *Melendez-Diaz,* the court held that sworn "certificates of analysis," stating that a substance seized by police and connected to the defendant contained cocaine, were testimonial and their admission violated the Confrontation Clause. (*Melendez-Diaz, supra,* 557 U.S. at pp. 308-311.) In *Bullcoming,* the court held the Confrontation Clause prohibited admission of a forensic laboratory report, certifying that the defendant's blood alcohol level was above the legal limit, through the in-court testimony of a scientist who neither observed nor performed the testing. (*Bullcoming v. New Mexico, supra,* 131 S.Ct. at p. 2717.)

20

in *Williams* . . . rejects the premise that the out-of-court statement is not admitted for its truth.' [Citation.]" (*Valadez, supra,* 220 Cal.App.4th at p. 32.)

*Valadez* concluded: "If the currently constituted courts were called upon to resolve this issue, it seems likely the holdings in *Thomas*, *Hill*, and other cases extending *Gardeley* to find out-of-court statements offered as expert basis evidence are not offered for their truth for confrontation purposes will be significantly undermined." (*Valadez, supra,* 220 Cal.App.4th at p. 32.)[16] We similarly noted in *Mercado*: "Although the *Williams* plurality concluded expert basis testimony does not constitute hearsay because it is not admitted for its truth, both Justice Thomas and the *Williams* dissenters rejected that analysis, concluding the evidence at issue had been admitted for its truth." (*People v. Mercado, supra,* 216 Cal.App.4th at p. 89.) We also observed that at least six of the seven California Supreme Court justices appear to agree that for purposes of the Confrontation Clause, out-of-court statements admitted as basis evidence during expert testimony are admitted for their truth if treated as factual by the expert. (*Id.* at fn. 6.)[17]

The People argue that because *Melendez-Diaz, Bullcoming,* and *Williams* addressed scientific evidence, not expert opinion of the sort presented by a gang expert, they have no application here. Instead, they urge that the earlier California cases discussed *ante—Gardeley, Thomas, Sisneros, Cooper,* and *Ramirez*—govern the outcome of the instant matter. To be sure, *Melendez-Diaz, Bullcoming,* and *Williams*, as well as the recent California trilogy of cases, are an imperfect factual template given the

---

[16]     *Valadez* did not decide the question, instead holding that the statements at issue were not testimonial.

[17]     In *Dungo,* Justice Chin's concurring opinion set forth an amplified explanation of how to harmonize the views expressed in *Williams.* (*People v. Dungo, supra,* 55 Cal.4th at p. 628 (conc. opn. of Chin, J.).) Justice Chin reasoned that where no Confrontation Clause violation exists under *both* the plurality's and Justice Thomas's concurring opinions, a reviewing court can conclude there is no *Crawford* error. (*Id.* at pp. 628-629; see *People v. Mercado, supra,* 216 Cal.App.4th at p. 87.) This approach does not come into play here because, as we have explained, Justice Thomas's concurrence rejected the plurality's analysis regarding the admission of expert basis evidence.

21

different contexts in which the expert testimony-confrontation issues arose. Nevertheless, it appears that the underlying principles articulated in these cases may be equally applicable to all expert testimony. We need not reach this question, however, because as we discuss *post,* assuming arguendo that Diederich's testimony about Medina's statements was offered for its truth, any violation of the Confrontation Clause was harmless beyond a reasonable doubt.

(iii)     *Were Medina's statements to Diederich testimonial?*

We next consider whether Medina's statements were testimonial. "Although the high court has not agreed on a definition of 'testimonial,' a review of the [*Crawford-Melendez-Diaz-Bullcoming-Williams* quartet] indicates that a statement is testimonial when two critical components are present. [¶] First, to be testimonial the out-of-court statement must have been made with some degree of formality or solemnity. [Citations.] The degree of formality required, however, remains a subject of dispute in the United States Supreme Court. [Citation.] [¶] Second, all nine high court justices agree that an out-of-court statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution, but they do not agree on what the statement's primary purpose must be." (*Lopez, supra,* 55 Cal.4th at pp. 581-582; *People v. Mercado, supra,* 216 Cal.App.4th 87; *People v. Barba, supra,* 215 Cal.App.4th at pp. 720-721.)

Here it seems likely that a majority of the Supreme Court justices would conclude Medina's statements were testimonial. *Crawford* stated that statements taken by police officers during interrogations, including statements by a witness in response to structured police questioning, are testimonial. (*Crawford, supra,* 541 U.S. at p. 52; *Valadez, supra,* 220 Cal.App.4th at p. 33; *People v. Cage, supra,* 40 Cal.4th at p. 978.) In *Davis v. Washington,* the court clarified: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. *They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecutio*n." (*Davis v.*

22

*Washington, supra,* 547 U.S. 813, 822, italics added; see also *People v. Cage, supra,* at pp. 984-985 [statement made to an officer over one hour after an assault was testimonial because the primary purpose was to investigate the crime].)

*Cage* "derive[d] several basic principles from *Davis.* First, . . . the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony. Third, the statement must have been given and taken *primarily* for the *purpose* ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial. Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation. Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses. Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*People v. Cage, supra,* 40 Cal.4th at p. 984, fns. omitted; *Valadez, supra,* 220 Cal.App.4th at pp. 33-34.)

In *Michigan v. Bryant* (2011) 562 U.S. __ [131 S.Ct. 1143], police found the mortally wounded victim in a parking lot. His statements identifying his shooter and describing the shooting were not testimonial, because their primary purpose was to enable police to respond to an ongoing emergency. (*Id.* at p. 1150.) The statements were also not sufficiently formal: they were made in an exposed, public area, in a disorganized fashion, before emergency medical services arrived. (*Id.* at p. 1160; see also *People v. Blacksher* (2011) 52 Cal.4th 769, 811-816.)

Here, Medina's statements were made under circumstances that imparted the requisite degree of formality. Agent Diederich testified that when the DEA "signs up" a

confidential informant, "there are forms that are signed, agreements, personal histories are taken, fingerprints are taken, photographs are taken, and they are assigned a number. . . . Before you can make a payment to somebody, you would have to have them in a sense sign up in the books." Medina signed such forms, and was paid a substantial sum of money for his information. These circumstances contrast with the type of informal, unstructured police interactions with gang members that have typically been held to produce nontestimonial statements. (See, e.g., *People v. Hill, supra,* 191 Cal.App.4th at pp. 1135-1136; *Valadez, supra,* 220 Cal.App.4th at pp. 35-36.) Nor were Medina's statements made during a contemporaneous emergency. (See *Michigan v. Bryant, supra,* 131 S.Ct. at p. 1160.)

Further, it appears the primary purpose of Medina's statements to Agent Diederich was to produce evidence about past events for possible use at a criminal trial. Diederich testified that Medina's statements led to "evidence being seized and convictions being obtained." Diederich's conversations with Medina were part of his investigation into ongoing drug trafficking involving the Martinez family. Of course, Diederich was not investigating the Westside Clothing store crimes or specifically targeting Robles or Garcia; at the time of the conversations at issue, the Westside Clothing store murders had not yet occurred. However, it appears that a majority of the Supreme Court justices would not consider this distinction significant. For the *Williams* dissenters, the pertinent inquiry is whether the evidence was generated "for the primary purpose of establishing 'past events potentially relevant to later criminal prosecution'—in other words, for the purpose of providing evidence." (*Williams,* 132 S.Ct. at p. 2273 (dis. opn. of Kagan, J.); see *Lopez, supra,* 55 Cal.4th at p. 582.) For Justice Thomas, the pertinent inquiry is whether the statement was "primarily intend[ed] to establish some fact with the understanding that [the] statement may be used in a criminal prosecution." (*Williams,* at p. 2261 (conc. opn. of Thomas, J.); *Lopez, supra,* at p. 582.) These standards appear to be satisfied here.

24

(iv) *Were Medina's testimonial statements admitted, and, if so, was the error harmless?*

As noted *ante,* the trial court excluded significant portions of Diederich's proposed testimony after the Evidence Code section 402 hearing; it also sustained numerous hearsay objections during his trial testimony. Almost without exception, Diederich's trial testimony was based not only on Medina's statements, but also on his training and experience and/or information he gleaned from other law enforcement officers. Robles nonetheless avers that Medina was Diederich's sole source of information showing the Westside Clothing homicides were a Mexican Mafia hit, and that the relationship between Lennox 13 and the Mexican Mafia made it "likely that a Lennox 13 gang member would have participated in it." In support of these contentions, Robles points to three aspects of Diederich's testimony.[18]

a. *Testimony that Termite was a significant narcotics dealer.*

Robles first avers that "Medina was Diederich's sole source of information that Termite of Santa Monica was a significant dealer of narcotics who had failed to pay his taxes to the Mexican Mafia." He urges, "The only factual basis in the record for connecting the Westside Clothing homicides to the Mexican Mafia was Diederich's testimony that Arturo Arce," the co-owner of Westside Clothing, "was the same

---

[18] In his opening brief, Robles averred that Medina was the only source of Diederich's information about (1) the relationship between the Westside gangs and the Mexican Mafia; (2) Termite from Santa Monica, his narcotics activities, and his alleged place of residence; (3) the Mexican Mafia's policies of issuing green lights on gang members who did not adhere to their rules; (4) the Mexican Mafia's instructions to gang members to carry out homicides by getting out of a car and shooting victims in the head; and (5) the fact that members of the Lennox 13 and Culver City gangs would be aware of the Mexican Mafia's policies on the latter point. In a detailed response, the People point out that as to three of the aforementioned topics, Diederich explicitly relied for his information on sources other than, or in addition to, Medina, and four of the five topics were covered and corroborated by the testimony of Sergeant Valdemar. In his reply brief, Robles concedes that the assertion in his opening brief about the five topics "appears to have been an overstatement." We address only those aspects of the evidence that Robles continues to challenge in his reply brief.

25

'Termite' who had failed to pay his 'taxes' and who was on a green light list issued by the Mexican Mafia."

Robles's contentions fail in large part as a factual matter. Diederich did not directly testify at trial that the Termite about whom he testified was Arce, or co-owned Westside Clothing.[19] Diederich did not testify at trial that Termite (or Arce) had failed to pay taxes to the Mexican Mafia. Diederich did not testify at trial that Termite was on a green light list.

Diederich did testify that "Termite" from Santa Monica was a significant distributor of cocaine, who dealt in quantities of one kilogram or more. It appears that his testimony on this point came directly and solely from Medina. Assuming arguendo it was offered for its truth, it was admitted in violation of the Confrontation Clause.

However, admission of the testimony was harmless beyond a reasonable doubt. (See *People v. Rutterschmidt, supra,* 55 Cal.4th at p. 661 ["Violation of the Sixth Amendment's confrontation right requires reversal of the judgment against a criminal defendant unless the prosecution can show 'beyond a reasonable doubt' that the error was harmless"]; *Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Livingston, supra,* 53 Cal.4th at p. 1159.) Far from being the "glue that held the prosecution's theory of the case together," as Robles avers, Diederich's testimony on this point was far from crucial. Among other evidence on the point, the jury learned from Valdemar's testimony that "Termite from Santa Monica" was on several green light lists, which were introduced into evidence. The jury learned from Valdemar and Detective Bambrick that Arce was "Termite" from Santa Monica. The jury also knew through Detective Bambrick that Arce was arrested in October 1997 for participating in the sale of a small amount of cocaine. Given that the jury already knew Arce was on a "green light" list, demonstrating he had committed some infraction earning the ire of the Mexican Mafia and a death sentence, the quantity of cocaine he trafficked was largely immaterial. (*People v. Livingston, supra,* 53 Cal.4th at pp. 1159-1160.)

---

[19]     Diederich did testify that he had received information that Termite lived near Ninth and Lincoln in Santa Monica, but was unable to corroborate this information.

b.        *Testimony that the Lennox 13 gang distributed drugs under the auspices of the Mexican Mafia.*

Robles next complains that Medina was Diederich's sole source of information to show the Lennox 13 gang was involved in Mexican Mafia sponsored drug trafficking, a fact that was crucial to explain why a Lennox 13 gang member such as Robles would carry out a green light hit for the Mexican Mafia.

However, it is not clear that Diederich's only source for this information was Medina.  At the Evidence Code section 402 hearing Diederich stated that his information about the Martinez family was only based in part on what Medina told him.  Diederich corroborated Medina's information about the Martinez family's supplying cocaine to the Lennox 13 gang when the DEA seized narcotics at a stash location controlled by a Martinez family member.  Diederich believed, but was not sure, the location was being guarded by a Lennox 13 gang member with the moniker "Mouse."  Diederich also corroborated information about the Martinez family's drug distribution:  "Through surveillance, the execution of search warrants, arrests and wire taps, we were able to confirm and seize narcotics from the Martinez family members or organizational members."

Moreover, the organizational chart provided evidence the Lennox gang was part of the Mexican Mafia run drug distribution network.  That chart included the names of the gangs to which the drugs were distributed, including Lennox 13.  Although the chart was first explained to Diederich by Medina, he subsequently confirmed its accuracy with Sergeant Valdemar.  Diederich also talked to Deputy Karen Shanka, a Lennox 13 expert, regarding "what was happening with Lennox 13 and Hector Marroquin."

We do not believe *Crawford* and its progeny prohibit an expert from basing his or her opinions on information gleaned from a testimonial source that was subsequently corroborated and reiterated by other, nontestimonial sources such as other law enforcement officials.  (See *Valadez, supra,* 220 Cal.App.4th at p. 29; *U.S. v. Johnson* (4th Cir. 2009) 587 F.3d 625, 635.)  Nothing suggests Diederich's conversations with Sergeant Valdemar or Deputy Shanka were testimonial, and appellants do not contend

admission of their information violated the Confrontation Clause. It appears Diederich could have testified to the same fact—that Lennox 13 was a link in the drug distribution chain approved by the Mexican Mafia—based on his conversations with other law enforcement personnel. Moreover, Valdemar confirmed the accuracy of the organizational chart Diederich testified about at trial, and testified that Lennox 13 was one of the gangs within the Mexican Mafia's control. Because this evidence came in through Valdemar as well as Diederich, to the extent Diederich's testimony about the Lennox 13 gang was based on Medina's testimonial hearsay, its admission was harmless beyond a reasonable doubt. (See *People v. Lewis* (2006) 139 Cal.App.4th 874, 887.)

          c.     *Testimony about the Mexican Mafia's directives on the method of execution.*

Third, appellants complain that Diederich's testimony about the Mexican Mafia's "no drive-by policy" violated the Confrontation Clause because Medina was Diederich's only source of information for this information. Appellants acknowledge that Sergeant Valdemar also testified regarding the no-drive-by policy, but hypothesize that Valdemar's information might have come from Medina as well.

Diederich's actual trial testimony regarding the no-drive-by policy was minimal. When asked for his opinion on how a person who had been "greenlighted" by the Mexican Mafia would be killed, Diederich answered: "To shoot the person, not from a car, but to shoot—get out, shoot the person in the head." Valdemar, in contrast, provided significantly fuller testimony on the point, as discussed in our recitation of the facts, *ante*. Valdemar's unchallenged testimony on the point was more complete and compelling than Diederich's. Robles's contention that Valdemar perhaps learned this information through the same meeting with Medina is purely speculative.

In any event, the no drive-by edict had limited probative value for the People here. The victims were *not* killed with a clean shot to the head that avoided injuring innocents; to the contrary, the assailants sprayed the store with a hail of bullets, hitting the victims— who were all innocent bystanders, not the intended target—multiple times. This was consistent with Valdemar's testimony that the Mexican Mafia's "signature method" for

28

killing was this type of "[o]verkill." For these reasons, to the extent Agent Diederich's brief testimony on the point was based on testimonial hearsay and offered for its truth, admission was harmless beyond a reasonable doubt.

Finally, Robles suggests a comparison of Agent Diederich's testimony at the first and second trials demonstrates his testimony at the second trial was prejudicial. He suggests that at the second trial, Diederich was prohibited from identifying Medina as the source of his information about the Mexican Mafia, and this "conceal[ment]" of Medina's involvement exacerbated the error in admitting Diederich's testimony. But as we discuss *post,* the jury at the second trial was clearly informed that Medina had provided Diederich with information regarding the Mexican Mafia's control of the Westside drug distribution, which Diederich relied upon in formulating his opinion. Moreover, we have compared Diederich's testimony in the two trials and see no possibility that his testimony was more damaging to the defense at the second trial.

## II. *Admission of Agent Diederich's testimony did not deprive appellants of a fair trial.*

Appellants contend, in a related argument, that the "admission of hidden testimonial hearsay in Diederich's testimony deprived them of their rights to a jury trial. Robles echoes the arguments made in his confrontation argument, urging that the purported error in admitting Diederich's testimony was exacerbated by allowing Diederich to characterize the information he received from Medina as opinion, without disclosing the source of the information to the jury. By relying on testimonial hearsay, appellants urge, "the expert witness has *ipso facto* determined that the hearsay is reliable."

This argument fails as a factual matter. That Medina provided Diederich with information which assisted Diederich in formulating his testimony was by no means "hidden" from the jury. At the outset of his testimony, Diederich explained that he met with and relied on Medina as a paid informant between December 1997 and April 1999. He testified that Medina gave him "information on narcotics trafficking, on [a] narcotic trafficking family based in the Hawthorne area and the distribution of narcotics to gangs."

29

He also testified that Medina provided him with the organizational chart, and acknowledged that Medina's information helped him form his opinion about the Mexican Mafia and drug trafficking on the Westside. As the People correctly point out, "the jury was well aware that Medina was a primary source, but not the only source," for much of Diederich's knowledge and opinion. Furthermore, as we have already explained, admission of the challenged portions of Diederich's testimony was harmless beyond a reasonable doubt. For the same reasons, he was not deprived of his right to trial.

**III.** *Evidence of hostilities between the Santa Monica 17 and Culver City Boys gangs.*

a. *Additional facts.*

At several points during trial, Robles's counsel sought to introduce evidence of the gang feud extant between the Culver City Boys and the Santa Monica 17 gangs in October 1998. Robles's counsel averred that such evidence would show the Westside Clothing shooting was committed as part of the gang war, rather than as a Mexican Mafia execution, and would establish Robles, who belonged to a gang not embroiled in the feud, lacked a motive to commit the shooting. The prosecutor and appellant Garcia objected on grounds the proffered evidence was irrelevant and speculative; was based on hearsay; and was improper third party culpability evidence, in that Robles did not have evidence sufficiently linking the Westside Clothing store crimes to the gang feud.

The trial court reasoned that the gang war evidence was relevant to establish a possible motive for the charged crimes, which Robles—a Lennox 13 gang member— would not have shared. It explained: "I don't really see this as third party culpability [evidence] . . . . Third party culpability is where you're pointing to a specific person and saying that person looks like the suspect in this case. [Robles's counsel is] not really doing that. She's trying to establish a motive for the crime, to exclude her client from having that motive." The court reasoned that the People had put on considerable evidence of motive, and fairness required that the defense be able to counter that evidence by showing Robles lacked a motive. In accordance with Evidence Code section 352, the court ruled Robles could introduce the dates of the prior shootings, the

names of the suspect(s), and the suspects' gang affiliations.  The court excluded
(1) evidence of the details of the other shootings; (2) the opinion of two Santa Monica
detectives that the charged crimes were committed as part of the gang feud; and
(3) evidence that a shooting at the Mar Vista Gardens in Culver City occurred on the
same day as the charged crimes.

Appellants now advance competing arguments regarding the trial court's ruling.
Robles asserts that the limitation on his presentation of gang war evidence deprived him
of his right to present a defense.  Garcia, on the other hand, argues admission of the gang
war evidence was erroneous, and violated his due process rights.  We conclude the trial
court properly admitted and limited the gang war evidence.

        b.        *Admission of the gang war evidence was not error.*

A trial court has broad discretion in determining whether evidence is relevant and
whether Evidence Code section 352 precludes its admission.  (*People v. Mills* (2010)
48 Cal.4th 158, 195; *People v. Williams* (2008) 43 Cal.4th 584, 634.)  We apply the abuse
of discretion standard to a trial court's rulings on the admissibility of evidence, including
those turning on the relevance or probative value of the evidence in question.  (*People v.
Lee* (2011) 51 Cal.4th 620, 643; *People  v. Hamilton* (2009) 45 Cal.4th 863, 930.)

Here, we cannot fault the trial court's reasoning that a limited amount of evidence
regarding the hostilities between the Santa Monica 17 and Culver City Boys gangs was
relevant.  Evidence of gang affiliation and activity is generally admissible where such
evidence shows motive or intent.  (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539,
1550; *People v. Funes* (1994) 23 Cal.App.4th 1506, 1519 [evidence of gang attacks were
"relevant to the issue of motive (retaliation as part of an ongoing rivalry between the two
gangs)"]; cf. *People v. Watson* (2008) 43 Cal.4th 652, 686 [defendant "had a motive for
the killings, given the active gang war between defendant's gang and Atlantic Drive
Crips"].)  " '[B]ecause a motive is ordinarily the incentive for criminal behavior, its
probative value generally exceeds its prejudicial effect, and wide latitude is permitted in
admitting evidence of its existence.' " (*Gonzalez,* at p. 1550.)  As the trial court
reasoned, the prosecution presented considerable evidence to show the charged crimes

were committed at the behest of the Mexican Mafia, to discipline a gang member who failed to pay his "taxes." Robles was entitled to attempt to disprove this theory by showing the crimes were committed for an entirely different motive—retaliation in a gang feud—that he did not share.

Garcia complains, as the prosecutor did below, that the evidence was nothing more than thinly disguised third party culpability evidence. " 'The principles of law are clear. . . . [T]he standard for admitting evidence of third party culpability [is] the same as for other exculpatory evidence: the evidence [has] to be relevant under Evidence Code section 350, and its probative value [can]not be "substantially outweighed by the risk of undue delay, prejudice, or confusion" under Evidence Code section 352.' " (*People v. Geier* (2007) 41 Cal.4th 555, 581.) To be admissible, the third-party evidence "need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt." (*People v. Hall* (1986) 41 Cal.3d 826, 833.) However, the evidence must " ' "link the third person either directly or circumstantially to the actual perpetration of the crime." ' " (*People v. Edwards* (2013) 57 Cal.4th 658, 729.) " 'The rule does "not require that any evidence, however remote, must be admitted to show a third party's possible culpability . . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." [Citation.]' " (*People v. Panah* (2005) 35 Cal.4th 395, 481.)

Here, if the jury believed the Westside Clothing shootings were carried out in retaliation for an earlier Santa Monica 17 gang shooting, that evidence could have raised a reasonable doubt that Robles, who was not allied with the Culver City Boys, was not a participant. The evidence supporting this theory amounted to more than a showing of mere motive or opportunity. Instead there was evidence that two criminal street gangs were actually engaged in hostilities. This stands in contrast to cases holding third party culpability evidence was insufficiently supported. For example, *Hall* explained: " 'if evidence of motive alone upon the part of other persons were admissible, . . . in a case

32

involving the killing of a man who had led an active and aggressive life it might easily be possible for the defendant to produce evidence tending to show that hundreds of other persons had some motive or *animus* against the deceased . . . .' " (*People v. Hall, supra,* 41 Cal.3d at p. 835; see also, e.g., *People v. Geier, supra,* 41 Cal.4th at pp. 581-582 [evidence third party was with the victim the night of the murder, failed to return home, and later stated he had dropped the victim at her apartment, was properly excluded]; *People v. Panah, supra,* 35 Cal.4th at pp. 481-482; *People v. Sandoval* (1992) 4 Cal.4th 155, 176 [evidence victim "was the center of a violent criminal operation involving drugs and stolen cars and guns, and that any number of criminal accomplices or rivals could have killed him" was inadmissible; there was no evidence of another person's actual motive to commit the crimes]; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1137 [insufficient foundation for evidence of third party culpability where evidence was mere speculation].) If Robles had simply offered evidence that the Culver City gang was hostile to the Santa Monica gang, and therefore might have committed the shooting, the evidence would be analogous to that in the *Hall* illustration. But because the gangs were actually engaged in back-and-forth shootings at the very time the charged murders occurred, we believe there was sufficient foundation for admission of the evidence, even if characterized as third party culpability evidence.

But even if the gang war evidence was admitted in error, it was harmless. The erroneous admission of evidence requires reversal only if it is reasonably probable that appellant would have obtained a more favorable result had the evidence been excluded. (Evid. Code, § 353, subd. (b); *People v. Earp* (1999) 20 Cal.4th 826, 878; *People v. Avitia* (2005) 127 Cal.App.4th 185, 194.) The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair. (*People v. Hamilton, supra,* 45 Cal.4th at p. 930; *People v. Partida* (2005) 37 Cal.4th 428, 439.)

These standards are not met here. Garcia avers that the evidence was prejudicial because it amounted to improper propensity evidence, and the jury was likely to convict him simply because his gang was involved in a series of shootings. We disagree that the

challenged evidence had this effect. Apart from the evidence elicited by Robles, the jury already knew Garcia was a Culver City Boys gang member with the moniker "Psycho." The jury had already heard evidence that the Culver City gang participated in murders, narcotics sales, and robberies. The jury already knew Garcia had adorned himself with a tattoo reading " 'I'll ride for you CECE. We murderers[.]' " There was no evidence or innuendo suggesting that Garcia had participated in the other shootings. Thus, the facts here are distinguishable from those in the authorities cited by Garcia (*U.S. v. Bradley* (9th Cir. 1993) 5 F.3d 1317; *People v. Albarran* (2007) 149 Cal.App.4th 214, 228). The evidence adduced by Robles could not have prejudiced Garcia, given the nature of the evidence that was already before the jury. For the same reasons, Garcia's due process challenge fails.

      c.     *The trial court's evidentiary rulings did not deprive Robles of his right to present a defense.*

Robles raises the flip side of Garcia's argument, contending that the court erred by excluding certain additional evidence purportedly related to the gang war and limiting him to what he characterizes as a "bare bones" presentation. We disagree. Just because some evidence to show the existence of the gang war was admissible does not mean Robles had carte blanche to introduce cumulative and insignificant evidence on the topic. Relevant evidence may be excluded if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (Evid. Code, § 352; *People v. Lee*, *supra,* 51 Cal.4th at p. 643.)

The United States Constitution guarantees criminal defendants a meaningful opportunity to present a defense. (*People v. Cash* (2002) 28 Cal.4th 703, 727; *Crane v. Kentucky* (1986) 476 U.S. 683, 690.) Evidence that falls short of exonerating a defendant may still be critical to a defense. (*Cash*, at p. 727.) "A defendant has the general right to offer a defense through the testimony of his or her witnesses [citation], but a state court's application of ordinary rules of evidence—including the rule stated in Evidence Code section 352—generally does not infringe upon this right [citations]." (*People v. Cornwell*

34

(2005) 37 Cal.4th 50, 82, disapproved on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Thornton* (2007) 41 Cal.4th 391, 443-444; *People v. Harris* (2008) 43 Cal.4th 1269, 1291-1292.)  Although the complete exclusion of an accused's defense may constitute federal constitutional error, " ' "excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense." ' [Citation.]" (*Thornton,* at p. 443; *People v. Boyette* (2002) 29 Cal.4th 381, 427-428.)  "A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." (*United States v. Scheffer* (1998) 523 U.S. 303, 308.)  The erroneous exclusion of evidence requires reversal only if it is reasonably probable that appellant would have obtained a more favorable result had the evidence been allowed.  (Evid. Code, § 354; *People v. Richardson* (2008) 43 Cal.4th 959, 1001; *People v. Earp, supra,* 20 Cal.4th at p. 880.)

Here, a wealth of evidence about the gang war was adduced at trial.  At least three witnesses—Culver City Police Officer Albert Casillas, Santa Monica gang officer Eric Uyeno, and former Santa Monica Detective William Brown, testified that the Culver City Boys and the Santa Monica 17 gangs were embroiled in a gang war in October 1998. Casillas and Brown both testified regarding the murder of Culver City Boys gang member Omar Sevilla on October 12, 1998.  Officers believed Sevilla had been killed by Santa Monica gang members.  Defense witness Gary Steiner, a retired detective, testified that prior to the Sevilla murder, there were some gang-related incidents in Santa Monica but "it was generally quiet."  After the Sevilla shooting, there was an "upsurge" of activity.  Steiner explained:  "[W]e had a series of assaults, shootings, stabbings that resulted in either significant injuries or fatalities.  Some of them at the time appeared to be involved with gang activity and others were totally unrelated to gang activity, but for some reason after October 12th we had just a flurry of murders and lesser crimes that lasted for several weeks."  Brown testified that the "word on the street [w]as from gang officers and other individuals basically said that we were going to have a gang war from Culver City to Santa Monica."  Prosecution witness Valdemar testified on cross-examination that there had been approximately 20 shootings in Santa Monica in

35

September and October 1998. Uyeno similarly testified that there were "a lot" of shootings in Santa Monica during October 1998, although not all of them were attributed to gang members. Brown likewise testified that there were a series of shootings in Santa Monica between the date Sevilla was murdered and the charged crimes.

The defense elicited evidence regarding additional shootings occurring on October 10, 16, 17, and 18, 1998. Both Brown and Steiner testified that a shooting occurred in Santa Monica on October 10. Officer Uyeno investigated a shooting of four persons in a car on October 16. The victims were not gang members, but were in an area frequented by Santa Monica 17 members. In Uyeno's view, the shooting was gang-related. However, no suspect was identified in the case, and no one was arrested. Steiner investigated an October 17 shooting that occurred at 20th Street and Lincoln Boulevard in Santa Monica. The victim was Juan Martin Campos. Retired Santa Monica police officers Shane Talbot and Harry Young testified that they investigated a shooting that occurred in Santa Monica on October 18, 1998. The victim was Jaime Cruz, a former Santa Monica 17 gang member. Alex Acuna and Marcos Camarillo were arrested for the shooting. Casillas testified that Acuna was a Culver City Boys gang member.

Detective Brown, who was one of the investigating officers on the charged crimes, testified that when investigating the Westside Clothing store murders he took a blood sample from Sevilla's brother, who was a Culver City Boys gang member, because Brown believed the brother might be involved in the Westside Clothing shootings. When preparing six-pack photographic lineups for use in investigating the case, he used photographs of Culver City gang members. Brown testified that when he had been investigating the murders years before, he felt the October 27 Westside Clothing shootings were in retaliation for the murder of Sevilla.

Additionally, Casillas testified that it is common for one gang to retaliate against another if one of its members is killed. Steiner testified that the Santa Monica 17 gang claimed all of Santa Monica as its territory. The Westside Clothing store was located in a gang area, and Santa Monica 17 gang members were often in close proximity to it.

We do not agree with Robles's characterization of this evidence as "skeletal." To the contrary, from this ample evidence Robles was fully able to—and did—effectively argue to the jury his theory that the Westside Clothing crimes were not a Mexican Mafia hit, but were an outgrowth of the gang hostilities between the Culver City and Santa Monica gangs.

Despite this, Robles avers that: "To properly evaluate the merits of the defense theory . . . the jury needed to know *all* the facts about the gang war, starting with the murder of Omar Sevilla and continuing through the Mar Vista Gardens murder of a Culver City gang member that occurred after the Westside Clothing crimes." (Italics in original.) We disagree. It is not clear from the record before us that the type of comprehensive evidence Robles suggests should have been admitted was even available. In any event, admission of all details on all the shootings would have consumed an inordinate amount of time, lacked probative value, and had the potential to confuse the jury. Exclusion of the evidence under Evidence Code section 352 was therefore proper. "The principle that undergirds the defendant's right to present exculpatory evidence is also the source of essential limitations on the right. . . . The trial process would be a shambles if either party had an absolute right to control the time and content of his witnesses' testimony. . . . The State's interest in the orderly conduct of a criminal trial is sufficient to justify the imposition and enforcement of firm, though not always inflexible, rules relating to the identification and presentation of evidence." (*Taylor v. Illinois* (1988) 484 U.S. 400, 410-411.)

*People v. Funes, supra,* 23 Cal.App.4th 1506, cited by Robles, does not compel a different conclusion. *Funes* held that a trial court did not abuse its discretion by permitting the prosecution to introduce evidence of nine prior incidents occurring in a gang war, some of which involved the defendant. (*Id.* at pp. 1511-1513, 1519.) *Funes* did not hold that admission of such evidence was *required,* only that, on the facts of that case, it was not an abuse of discretion to admit it. (*Id.* at pp. 1518-1519.) As the People point out, *Funes* did not purport to set a boundary for what *must* be allowed.

37

We discern no error in regard to the specific evidentiary exclusions challenged by Robles. First, the trial court did not err by excluding details of the gang-war shootings. Among other things, defense counsel never made a sufficient offer of proof demonstrating any similarities between the charged crimes and the other October incidents to make such evidence relevant. She averred only that in the October 17 shooting, the three men who followed a pedestrian into a liquor store were driving a stolen Dodge Neon, the same sort of car used here; in the October 18 incident, the vehicle was also a stolen Dodge; and in one shooting, the assailants purportedly used "the same type of weapon." None of these purported similarities were significant enough to allow the jury to draw the inference that the same people, or same gang, committed those incidents and the Westside Clothing Store crimes. (Cf. *People v. Harris* (2013) 57 Cal.4th 804, 841 [for prior crimes to be admissible to prove identity, the pattern and characteristics of the uncharged misconduct and the charged offense must be so unusual and distinctive as to be like a signature].) The trial court correctly reasoned that admission of such evidence here had the potential to confuse the jury. Although Robles contends the details of the other crimes were essential to his defense, his counsel never made a further offer of proof showing that evidence of other details existed, and he mentions no others on appeal.

Robles also complains that he was not allowed to introduce evidence that shootings occurred on October 13 and 14 because the identity of the assailants was unknown. Assuming arguendo Robles actually had such evidence to present, we see no error. As Officer Uyeno testified, not all the shootings in Santa Monica during October 1998 were attributable to gang members. Defense counsel admitted she did not know if the October 14 shooting involved the Culver City Boys. Attacks that were not related to the gang war were irrelevant. Thus, absent evidence showing the assailants were gang members, such evidence was properly excluded. In any event, evidence of these two shootings was cumulative and therefore lacked probative value, and exclusion was necessarily harmless.

38

Likewise, the trial court did not err by excluding opinion testimony from retired police officers. After an Evidence Code section 402 hearing, the trial court ruled Detective Talbot did not qualify as a gang expert, a ruling Robles does not challenge. Therefore Talbot was not competent to offer an opinion on why the charged crimes occurred. The trial court also correctly precluded Robles from asking Detective Steiner whether, in his opinion, the charged crimes were committed in retaliation for the Sevilla murder. Detective Steiner handled the case in 2001. At that time, police were unaware of the significant evidence presented at trial, including the DNA evidence, the eyewitness identifications, and Kube's testimony regarding appellants' statements. The detective's opinion regarding the motive for the crime, based on the state of the evidence in 2001, was not probative. Moreover, any error in this regard was harmless: contrary to Robles's argument, Detective Brown *was* allowed to offer such testimony and opined that when he had been investigating years before, he surmised that the Westside Clothing shootings were in retaliation for Sevilla's murder.

Finally, exclusion of the October 27 Mar Vista Gardens shooting was not prejudicial error. Robles sought to introduce evidence that on the evening of the Westside Clothing shooting, a Santa Monica gang member carried out a shooting of a Culver City Boy gang member in the Mar Vista Gardens. According to defense counsel, a conviction had been obtained in the case. The trial court excluded the evidence on the ground it went to third party culpability, not motive, which was Robles's original basis for seeking to admit the gang war evidence; it was cumulative; it lacked probative value; and it could potentially confuse the issues. This was not an abuse of discretion, for the reasons we have set forth. Even assuming arguendo the court's first ground for exclusion was error, as Robles asserts, the second ground clearly was not. As the trial court reasoned, the evidence already showed a gang war, with "back and forth" shootings, was transpiring. Cumulative evidence of this fact would have been of minimal assistance to the defense.

39

**IV.**  *Evidence of Garcia's prior robbery was properly admitted.*

    a.    *Additional facts.*

Prior to trial, Garcia moved to exclude evidence of his prior home invasion robbery of Tadayon.  He argued, inter alia, that the crimes were insufficiently similar, and evidence of the prior crime was highly prejudicial.  The prosecutor countered that the evidence was relevant to show intent and motive.  The trial court concluded the evidence was not probative on the issue of intent, but was probative to show motive.  The court recognized that any prior bad act is prejudicial, but the prior crime was not as egregious as the charged offenses.

    b.    *Discussion.*

Garcia argues that the trial court's ruling was error because there was insufficient similarity between the Tadayon robbery and the charged murders; there was insufficient foundation for the People's theory that the Westside Clothing store murders were a Mexican Mafia hit; and the evidence was unduly prejudicial.  He argues that evidence of the prior incident served only to convince the jury he was the type of person who would have committed the charged crimes.  We disagree.

Only relevant evidence is admissible.  (Evid. Code, § 350.)  Evidence is relevant if it has a tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.  (Evid. Code, § 210; *People v. Mills, supra,* 48 Cal.4th at p. 193; *People v. Lee, supra,* 51 Cal.4th at p. 642.)  A trial court has broad discretion in determining whether evidence is relevant and whether Evidence Code section 352 precludes its admission, but lacks discretion to admit irrelevant evidence.  (*People v. Cowan* (2010) 50 Cal.4th 401, 482; *Mills*, at p. 195; *People v. Williams* (2008) 43 Cal.4th 584, 634.)

Evidence that a defendant committed misconduct other than that currently charged is generally inadmissible to prove he or she had a propensity to commit the charged crime.  (Evid. Code, § 1101, subd. (a); *People v. Kelly* (2007) 42 Cal.4th 763, 782; *People v. Rogers* (2009) 46 Cal.4th 1136, 1165.)  However, such evidence is admissible if it is relevant to prove, among other things, intent, knowledge, identity, motive, or the

existence of a common design or plan. (Evid. Code, § 1101, subd. (b); *People v. Carter* (2005) 36 Cal.4th 1114, 1147; *People v. Ewoldt* (1994) 7 Cal.4th 380, 400; *People v. Spector* (2011) 194 Cal.App.4th 1335, 1374.) "The categories listed in section 1101, subdivision (b), are examples of facts that legitimately may be proved by other-crimes evidence, but . . . the list is not exclusive. [Citations.]" (*People v. Catlin* (2001) 26 Cal.4th 81, 146; *Spector,* at p. 1373.) Although evidence of prior offenses may not be introduced solely to prove criminal disposition, it may be admitted whenever it tends " 'logically, naturally, and by reasonable inference to establish any fact material for the People or to overcome any material matter sought to be proved by the defense.' " (*Spector,* at p. 1373.)

When reviewing the admission of evidence of other offenses, a court must consider: (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crimes evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant. (*People v. Fuiava* (2012) 53 Cal.4th 622, 667; *People v. Spector, supra,* 194 Cal.App.4th at pp. 1372-1373.) Even if other crimes evidence is admissible under Evidence Code section 1101, subdivision (b), it should be excluded under Evidence Code section 352 if its probative value is substantially outweighed by undue prejudice. (*People v. Thomas* (2011) 52 Cal.4th 336, 354.) Because evidence relating to uncharged misconduct may be highly prejudicial, its admission requires careful analysis. (*Fuiava*, at p. 667; *People v. Ewoldt*, *supra*, 7 Cal.4th at p. 404.) " ' " 'Prejudice' as contemplated by [Evidence Code] section 352 is not so sweeping as to include any evidence the opponent finds inconvenient. Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent." ' " (*People v. Scott* (2011) 52 Cal.4th 452, 490.) Evidence is prejudicial under Evidence Code section 352 if it uniquely tends to evoke an emotional bias against the defendant and has little effect on the issues. (*Id*. at p. 491.)

We review the trial court's rulings under Evidence Code sections 1101 and 352 for abuse of discretion, and view the evidence in the light most favorable to the ruling.

41

(*People v. Fuiava, supra,* 53 Cal.4th at pp. 667-668; *People v. Edwards, supra,* 57 Cal.4th at p. 711; *People v. Scott, supra*, 52 Cal.4th at p. 491; *People v. Thomas, supra*, 52 Cal.4th at pp. 354-355.)

Evidence of the prior Tadayon robbery was highly probative of the People's theory that Garcia committed the Westside Clothing store shootings because he was acting as an enforcer for the Mexican Mafia. Tadayon testified that both robbers said, " 'I know you've been selling narcotics in our territory. This is Mexican Mafia, Culver City Boys.' " Garcia's statement was therefore an admission that he was indeed working for the Mexican Mafia, enforcing the gang's requirement that drug sellers in the gang's territory pay taxes. As the trial court found, the evidence was probative to show Garcia was a "disciplinarian[] who [was] conducting business for the Mexican Mafia and that is their motive." Evidence that approximately two weeks before the charged crimes Garcia was acting in the capacity of a Mexican Mafia enforcer logically, naturally, and by reasonable inference suggested he had a motive for committing the Westside Clothing store homicides, and was one of the perpetrators of those crimes.

Garcia argues that the evidence was improperly admitted for several reasons. First, he urges that the prior and charged crimes lacked sufficient similarity. Evidence of uncharged crimes is admissible to prove identity, common plan, and intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference on these issues. (*People v. Edwards, supra,* 57 Cal.4th at p. 711; *People v. Ewoldt, supra,* 7 Cal.4th at p. 402.) The least degree of similarity is required to prove intent; the uncharged misconduct must only be sufficiently similar to support the inference the defendant probably harbored the same intent in each instance. (*Ewoldt,* at p. 402; *People v. Harris, supra,* 57 Cal.4th at p. 841.) A greater degree of similarity is required to prove the existence of a common design or plan; there must be not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally explained as caused by a general plan. (*Ewoldt,* at pp. 402-403; *Edwards,* at p. 712.) The greatest degree of similarity is required to prove identity; the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive to

42

support the inference the same person committed both acts; the pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature. (*Ewoldt,* at pp. 402-403; *Harris,* at p. 841.)

However, here the evidence of the Tadayon robbery was not admitted to prove intent, common plan, or identity; it was admitted to prove motive. (See *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 191 [argument that other-crimes evidence was too dissimilar to allow admission rejected where it was not admitted to prove intent, identity, or a common design or plan].) Other crimes evidence is admissible to establish motive where both crimes are explainable as the result of the same motive. (*People v. Spector, supra,* 194 Cal.App.4th at p. 1381.) The "probativeness of other-crimes evidence on the issue of motive does not necessarily depend on similarities between the charged and uncharged crimes, so long as the offenses have a direct logical nexus." (*People v. Demetrulias* (2006) 39 Cal.4th 1, 15.) There was such a direct logical nexus here: the evidence showed Garcia was working as a Mexican Mafia tax enforcer in both the charged and uncharged crimes, which occurred in close proximity.

Garcia next avers that the evidence was inadmissible because there was no "foundation for the prosecution's theory that the charged crimes were executions ordered by the Mexican Mafia," because Diederich conceded he was unable to verify that Termite was a cocaine dealer. This argument ignores the plethora of other evidence supporting the People's Mexican Mafia hit theory as detailed in our recitation of the facts, *ante,* including evidence that the Mexican Mafia controlled drug distribution by the Westside gangs; Garcia's admission to Kube that the shooting was "a hit for the big homies"; Arce's membership in the Santa Monica gang; and the fact Arce's name had been placed on a Mexican Mafia green light list.

Finally, Garcia contends evidence of the Tadayon robbery was unduly prejudicial. Certainly, the facts of the Tadayon home invasion robbery were troubling. However, that incident was not nearly as egregious as the charged crimes. While Tadayon and her friend Laurie were held for several hours and threatened, they were not physically hurt. In contrast, in the charged crimes two people were killed and two injured when masked

gunmen burst in and sprayed the store with gunfire. (See *People v. Eubanks* (2011) 53 Cal.4th 110, 144 [the potential for prejudice is decreased when testimony describing the defendant's uncharged acts is no stronger and no more inflammatory than the testimony concerning the charged offenses].) The evidence related to the prior crime was relatively brief and uncomplicated, and was unlikely to confuse or distract the jury. (See generally *People v. Frazier* (2001) 89 Cal.App.4th 30, 42.) The trial court gave a limiting instruction both during Tadayon's testimony, and again at the close of evidence, informing the jury that the evidence could be considered only on the issue of motive and could not be used to infer Garcia had a criminal disposition. The limiting instructions mitigated the possibility of prejudice. (*People v. Lewis* (2001) 25 Cal.4th 610, 637.) In sum, there was no error and no violation of Garcia's due process rights. (*People v. Lindberg* (2008) 45 Cal.4th 1, 26.)

> **V.** ***Testimony of the jailhouse informer.***

Prior to trial, Garcia, joined by Robles, argued Kube's testimony should be excluded under Evidence Code section 352 because Kube was an unreliable witness. Counsel urged Kube was "a convict with a long record who is essentially a professional snitch." According to counsel, Kube had acted as an informant in other cases and was attempting to obtain reconsideration of his own sentence in exchange for his testimony. The trial court denied appellants' request, finding that Kube's testimony was more probative than prejudicial.

Relying on federal law, Garcia argues that jailhouse informant testimony is inherently unreliable and must be excluded, and admission of Kube's testimony was reversible error. Garcia acknowledges that the California Supreme Court has upheld the admission of jailhouse informer testimony against identical due process challenges. (See, e.g., *People v. Hovarter* (2008) 44 Cal.4th 983, 997; *People v. Hoyos* (2007) 41 Cal.4th 872, 898; *People v. Wilson* (2005) 36 Cal.4th 309, 347; *People v. Jenkins* (2000) 22 Cal.4th 900, 1007-1008 ["we consistently have rejected the contention . . . that informant testimony is *inherently* unreliable"]; *People v. Ramos* (1997) 15 Cal.4th 1133, 1165 ["[w]ith respect to [the witness's] status as an inmate at the time he overheard

defendant's statements, no authority holds this circumstance requires exclusion of a witness's testimony. We have consistently rejected claims such evidence is inherently unreliable" (fn. omitted)].) As Garcia recognizes, we are bound by the Supreme Court's pronouncements on the issue.[20] (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450.) Moreover, appellants had ample opportunity to cross-examine Kube and expose any unreliability in his testimony, and the jury was instructed to consider his testimony with "caution and close scrutiny." (See *Hovarter,* at pp. 997-998.) Accordingly, we reject Garcia's claim.

**VI.** *Cumulative error.*

Appellants contend that the cumulative effect of the purported errors deprived them of a fair trial. As we have " 'either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial,' " we reach the same conclusion with respect to the cumulative effect of any purported errors. (*People v. Cole* (2004) 33 Cal.4th 1158, 1235-1236; *People v. Butler* (2009) 46 Cal.4th 847, 885.)

---

[20] Garcia explains that he raises the issue to preserve it for federal review.

## DISPOSITION

The judgments are affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

ALDRICH, J.

We concur:

KLEIN, P. J.

CROSKEY, J.